In the Matter of the LAST WILL AND TESTAMENT OF Bernice T. PALECKI, Deceased.

**Walter Palecki, Richard Palecki, Eugene Palecki, Helen Piorko Niemkiewicz, and Edward Piorko, Petitioners,**

v.

**Joseph Gornik, Individually, and Joseph Gornik, Executor of the Estate of Bernice T. Palecki, Respondent.**

C.A. No. 1594–N.

Court of Chancery of Delaware, New Castle County.

Submitted: April 9, 2007.
Decided: April 26, 2007.

---

Raymond M. Radulski, Raymond M. Radulski, Attorney at Law, Wilmington, DE, for Petitioners.

David J. Ferry, Jr., Rick S. Miller, Ferry, Joseph & Pearce, P.A., Wilmington, DE, for Respondent.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

Bernice Palecki crafted by hand an "Item Four" that works in concert with her holographic Last Will and Testament dated September 24, 1985 (the "Will"). If read together with the Will, the handcrafted addendum—which I will call the "Codicil"—makes sense of the rest of the Will, which would otherwise outline an incomplete dispositive scheme. The Will, in its itemized list of bequests and instructions, makes only one complete testamentary gift: leaving the entire estate to Bernice's sister, Helen Palecki, if Helen survived Bernice. Thereafter, however, the Will contains a handwritten numeral "4" followed by a dash and a series of blank lines. As such, the Will does not address the possibility that Helen might die before Bernice. The Codicil, which bears the title "Item Four," sets forth a bequest that fills that gap in both the text and dispositive scheme of the Will. In the event that Helen predeceases Bernice, the Codicil names most of Bernice's siblings (if they survive Bernice) and about half of her nieces and nephews as the contingent beneficiaries of her estate. Unlike the Will itself, the Codicil, although indisputably in the handwriting of Bernice Palecki, was not signed by her and bears no date.

Because all of Bernice Palecki's siblings died before she did, if the Codicil is given force, Bernice's estate will pass to the five nieces and nephews that she named in that writing. If, however, the Codicil is declared invalid, her estate will pass by intes-

tacy because the text of the Will itself makes no other disposition. In that case, all of Bernice's nieces and nephews will share in a portion of her estate.

The petitioners—Walter Palecki, Richard Palecki, Eugene Palecki, Helen Piorko Niemkiewicz, and Edward Piorko—are five nieces and nephews of Bernice Palecki who were not named as beneficiaries in the Codicil. Respondent Joseph Gornik is one of the beneficiaries named in the Codicil and the executor appointed in the Will.

The petitioners allege that the Codicil is invalid because it was not executed contemporaneously with the Will and because the absence of a signature renders it invalid under Delaware law. At this stage in the proceedings, discovery has been concluded, and respondent Gornik has moved for summary judgment. For purposes of this motion, Gornik concedes that there is a genuine dispute of fact about whether Bernice Palecki drafted the Codicil at the same time as the Will. Notwithstanding this factual dispute, Gornik argues that the Codicil is valid because there is no dispute that Palecki wrote it or that by its plain terms the Codicil works with the text of the Will in a sensible manner. Relying upon a recently-enacted New Jersey statute and the fact that Palecki lived in New Jersey at the time she drafted the Will and Codicil, Gornik argues that the absence of a signature is immaterial because New Jersey has now dispensed with a mandatory signature requirement. He argues that Delaware's probate choice of law statute, § 1306 of Title 12, should be read to validate the Codicil because the Codicil would be valid in New Jersey where Palecki was domiciled when she wrote it.

In this opinion, I reject Gornik's motion for summary judgment.

As Gornik's counsel admits, the plain language of the relevant Delaware statutes—12 *Del. C.* § 1306 and a related statute, 12 Del. C. § 202—only give deference to wills executed in other states when those wills are "signed by the testator" or by a representative of the testator in the testator's presence and at the testator's express direction. Those statutory sections are over thirty years old and date to a time when every state required wills and codicils to be signed. In recent years, a small number of states, including New Jersey, have dispensed with an absolute signature requirement. Gornik therefore seeks to have me "evolve" the relevant Delaware statutes in light of these developments, by reading out the requirement for a signature. In other words, Gornik would have me amend statutes of longstanding when the General Assembly has not done so.

Such a request cannot be granted, lest this court usurp the General Assembly's legislative powers by ignoring plain statutory text. Nor can illegitimate judicial amendments of these statutes be justified on the grounds that the statutes work absurd results. For one thing, the interpretive maxim that permits a court to eschew a literal reading of a textually-unambiguous statute on the grounds that the literal reading produces absurd results has to be used with great caution and delicacy, lest the judiciary's own sense of appropriate public policy outcomes usurp the powers entrusted to the elected legislative branch. For that reason, courts will only refuse to give effect to a linguistically faithful reading of a clear statute in the most extreme circumstances. As Chief Justice Marshall explained nearly two centuries ago, "[I]f ... the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of

applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." [1] That is not the case here. Although one may disagree with the statutory signature requirement, such a requirement remains a prevalent one that has the positive effect of creating an incentive for persons to take care to execute their wills and codicils with a level of formality that reduces the room for post-mortem disputes about the validity of those instruments. If the General Assembly comes to believe that the signature requirement should be relaxed and effect given to unsigned wills and codicils that would be valid under another state's law, it is, of course, free to act on that belief by amending the law. Until that time, this court must enforce the statutes as written.

## II. *Factual Background*

Bernice Palecki had at least seven brothers and sisters, but she did not have any children of her own. As of 1985, Bernice was a resident of Ventnor, New Jersey.

In September of that year, Bernice executed her holographic Will. The Will that Bernice prepared is a two-page, pre-printed form with a coversheet onto which she handwrote her last wishes. [2] On the series of blank lines on the form, Bernice wrote four numeric "Item" headings, but she only completed three of those items. The first and second items contained Bernice's burial wishes and directed that her debts and funeral expenses be paid by her estate. The third item ("Item 3") presents the only bequest written on the Will form itself. Item 3 reads:

> 3—If survived by my sister Helen, I leave everything I have, whatever it may be, to my sister Helen. [3]

Following this section, Bernice wrote "4—" but listed nothing thereafter. [4] As a result, the bottom of that page of the Will was left blank. As such, the Will itself made no provision for the possibility that Helen might die before Bernice.

In the Codicil, which was written on a separate, smaller sheet of paper than the Will itself, Bernice supplied the missing "Item 4" in the Will, naming most of her siblings and half of her nieces and nephews as beneficiaries in the event Helen predeceased her. The Codicil states:

> Item Four:
>
> If I should survive my sister Helen Palecki I request the execution of item one and item two and the cancellation of item three because of the death of Helen Palecki. I bequeath equal parts of my estate to my surviving brothers and sisters and to my neices (sic) and nephews here named. [5]

After this language, the Codicil provides a two column list. The left column is titled "Brothers and sisters" and lists Stanley Palecki, Walter Palecki, Mary Rupnicki, Stephanie, and Sophie Gornik. [6] This list comprised all of Bernice's siblings, save her sister Anna who had become a nun and changed her name to Sister M. Adelaide, OSF. The right column is titled "Nieces and nephews" and lists Regina Z., Francis P., Theresa Bradley, John Gornik, and re-

---

**1.** *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 202–03, 4 L.Ed. 529 (1819) (Marshall, C.J.).

**2.** Respondent's Opening Brief, Ex. A at 1–3.

**3.** *Id.* at 2.

**4.** *Id.*

**5.** *Id.*

**6.** *Id.* Bernice did not provide the last name of her sister Stephanie, but she did list the full titles of her other named siblings.

spondent Joseph Gornik.[7] Those five were not a complete list of Bernice's nieces and nephews, and the petitioners in this case comprise five of the remaining nieces and nephews who were not named in the Codicil.

The petitioners concede that the Codicil was written in Bernice Palecki's handwriting but point out the equally undisputed and important facts that the Codicil bears no date or signature. Because the Codicil bequeaths property to Bernice's brothers Walter and Stanley if "surviving," the only relevant evidence in the discovery record suggests the Codicil was written before they died in May 1990 and June 1991, respectively. As of that time, Bernice remained a New Jersey resident. Although the petitioners say it is uncertain when the Codicil was drafted, they have adduced no evidence suggesting a rational inference that the Codicil was written after 1991.

In 1994, Bernice moved to Delaware with her sister Helen because Helen had become terrified of the ocean after a violent summer storm sent waves crashing into the beachfront property in Ventor,

New Jersey where the two previously lived. Shortly after the move, in November of that year, Helen died, leaving Bernice to live alone in the new home they purchased in Delaware.[8]

Five years later, this court appointed Thomas Posatko of Supportive Care Services as the guardian of Bernice Palecki's person and property.[9] That appointment was designed to diffuse infighting among Bernice's nieces and nephews, much of which was centered on their conflicting desires about use of the property in Ventnor at the Jersey Shore and about care for her Wilmington home.[10] According to Posatko, Bernice Palecki was "fully oriented" at that time, and "the guardianship was [in his view] really requested ... on the basis of the fear of designing persons more so than anything else." [11]

Unfortunately, although Posatko apparently viewed Bernice as having the capacity rationally to discuss important matters with him in a non-coercive setting, Posatko never discussed with Bernice what she wished to do with her estate or whether she had a will.[12] At some point, Posatko

---

**7.** *Id.* The full last names of these nieces and nephews are specified in the Codicil, but because it is difficult to make out the spelling of these names on the copy provided to me and the parties have not clarified them, I have abbreviated them here. There is no dispute about the identity of these beneficiaries.

**8.** Deposition of Helen Piorko Niemkiewicz at 12, 17.

**9.** Stipulated Final Order Appointing A Guardian Of Property And Person, *Matter of Bernice Palecki*, C.M. No. 8898–NC (Del. Ch. June 10, 1999).

**10.** *See id.* at ¶ D (citing an inability to "properly manage and care for her property" and concerns "of becoming the victim of designing persons" as justifications for appointing a guardian).

**11.** Deposition of Thomas Posatko ("Posatko Dep.") at 4–5.

**12.** One of the many valuable services a neutral guardian of the person should perform is helping the ward fulfill her estate planning goals. As Posatko's deposition testimony illustrates, it is not unusual for a guardianship of the person to be put in place as to a person who is capable in the right setting of making important decisions for herself but who is vulnerable to designing persons. A guardian of the person can help the ward exercise as much self-determination as possible by discussing with the ward her estate planning intentions. In this case, for example, it is possible that Posatko considered Bernice to be capable, in the correct situation, of exercising testamentary intent during the early period in which he was her guardian. Had Posatko reviewed the Will and Codicil with Bernice, and had she affirmed that those instruments, read together, accurately expressed her intent, Posatko might have picked up on the fact that the Codicil was unsigned and sought counsel for Bernice to correct the

came into possession of a bunch of Bernice's financial records. The Will and Codicil were among those documents but Posatko never talked with Bernice about her testamentary plan. He claims to have simply skimmed them himself and stored them away in a safe.

Bernice resided in Delaware until her death on March 9, 2005. After Bernice died, Posatko filed the Will and Codicil with the Register of Wills of the State of Delaware.[13] From that point on, things get confusing. Suffice it to say for present purposes that there are a host of factual issues regarding the condition of the Will and Codicil. Among them is whether the Codicil was physically attached to the Will at the time Posatko received those documents and at the time he filed them with the Register of Wills. For now, what matters is that the parties agree that there is a factual question about whether the Codicil was prepared at the same time as the Will and meant to be a part of that document from the date the Will was signed, or whether it was prepared by Bernice at a later time.

### III. *Legal Analysis*

Now that discovery has closed, Gornik seeks summary judgment. He concedes

that there is a factual question whether the Codicil was prepared at a different time than the Will. Nonetheless, he also argues that there is no rational dispute of fact that the Codicil was prepared by Bernice Palecki herself while she was a resident of New Jersey, that the terms of the Codicil clearly indicate that it was to be read in concert with the Will, and that the Codicil was kept by Bernice together with the Will. Given that Bernice herself is not able to testify at trial, Gornik argues that the only rational inference one can draw from the record is that Bernice intended for the Codicil to govern the disposition of her estate in the event, as occurred, that Bernice's sister Helen predeceased her.

 In making that contention, Gornik concedes that the Codicil was not executed with the formalities required of wills by Delaware law—a signature and attestation by two or more credible witnesses.[14] Under Delaware law, separate writings intended to supplement a valid will generally must be executed with full testamentary formalities,[15] with one narrow exception concerning written statements or lists incorporated in a valid will that dispose of

---

lack of a signature, either by having her sign it in front of witnesses, or preparing a new will integrating the prior Will and Codicil into one printed, signed, and properly witnessed document. Although estate planning is undoubtedly a delicate matter for a guardian of the person to address, the reality is that if the guardian does not do so, the ward is left entirely to depend on her prior efforts at estate planning, however ineffective. The sad reality is that death silences the ability of the ward to speak for herself. Absent the active engagement of the guardian of the person in helping the ward implement her estate planning wishes, the ward is silenced even earlier by the guardianship itself, leading to the regrettable circumstance that the ward's loss of self-determination comes to include the invalidation of her estate planning goals when

steps could have been taken during her lifetime to secure the implementation of those goals after her death.

**13.** *Id.* at 5–6.

**14.** *See* 12 Del. C. § 202.

**15.** *See* Transcript of Oral Argument (Apr. 9, 2007) at 47 (agreeing that Bernice could not have "swapped in" a new Item 4 into her Will without adhering to testamentary formalities); *see also Walsh v. St. Joseph's Home for the Aged,* 303 A.2d 691, 694 (Del.Ch.1973) (applying the general rule that handwritten instructions not incorporated by a will and found separate from the will are invalid when not executed in accordance with statutory formalities required of wills).

tangible personal property not otherwise covered by the will's terms.[16] That exception proves the general rule and that exception, the parties agree, does not apply to the Codicil. A separate, unincorporated codicil to a will must be executed with the same formalities as the will it is addressing.[17]

But Gornik contends that because the Codicil was written when Bernice was in New Jersey, it should be given effect by this court if the Codicil would be considered valid under New Jersey law. To that point, Gornik asserts that the discovery record suggests that there is no evidence that would create a genuine issue of material fact regarding Bernice Palecki's testamentary intent—the key issue under New Jersey law. The Codicil and Will fit together in tongue and groove fashion, were both written in New Jersey by Bernice in years when her competence were not in question, and were stored together by her. Thus, Gornik submits that there is no rational question that Bernice intended the Codicil to have effect.

■ In response to Gornik's motion for summary judgment, the petitioners principally rely on a straightforward legal argument, which is that the relevant Delaware statutes governing the validity of wills and codicils of Delaware residents forbid this court from according recognition to an unsigned codicil, regardless of whether the codicil would be valid under the law of the state where it was written. For reasons I next explain, that contention is correct and is itself sufficient in to defeat Gornik's motion.

For purposes of examining this issue, I accept—as the petitioners largely do—that New Jersey law was recently amended to eliminate any absolute requirement for a will or codicil to be signed by the testator or by another person in the testator's presence and at the testator's direction.[18]

---

16. *See* 12 Del. C. § 212 (validating writings referred to in a valid will that dispose of certain tangible personal property if the writing is "either ... in the handwriting of the testator or ... signed by the testator").

17. *See* 1 Page on the Law of Wills § 1.3 (2003) ("A codicil is a will. It must be executed with the same formalities required in the execution of a will....").

18. The central statutory provision addressing the formalities usually required in the execution of a will or codicil in New Jersey is § 3B:3–2 of New Jersey's probate code. That provision was amended on August 31, 2004 to state:

a. Except as provided in subsection b. and in N.J.S.3B:3–3, a will shall be:
(1) in writing;
(2) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and at the testator's direction; and
(3) signed by at least two individuals, each of whom signed within a reasonable time after each witnessed either the signing of the will as described in paragraph (2) or the testator's acknowledgment of that signature or acknowledgment of the will.

b. A will that does not comply with subsection a. is valid as a writing intended as a will, whether or not witnessed, if the signature and material portions of the document are in the testator's handwriting.

c. Intent that the document constitutes the testator's will can be established by extrinsic evidence, including for writings intended as wills, portions of the document that are not in the testator's handwriting.

N.J. Stat. Ann. § 3B:3–2. On the same day, the following provision, which is captioned "3B:3–3. Noncomplaint execution; clear and convincing evidence of intent," was enacted:
Although a document or writing added upon a document was not executed in compliance with N.J.S.3B:3–2, the document or writing is treated as if it had been executed in compliance with N.J.S.3B:3–2 if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute: (1) the decedent's

In cases when the decedent did not sign the relevant testamentary documents, the will or codicil may be given effect if it is proven by clear and convincing evidence that the decedent intended the codicil to amend her will.[19] The revised New Jersey statutes reflected an acceptance of scholarly assertions that the law ought to be less rigid about invalidating wills that were not executed with the normally-expected formalities,[20] much in the same way that Delaware law, for example, addressed oral contracts for the sale of land that are presumptively invalid under the statute of frauds.[21] The revised New Jersey statutes were enacted on August 31, 2004 and went into effect six months later on February 27, 2005.[22] Bernice died on March 9, 2005, shortly after the effective date of these revisions.

As of the time Bernice signed her Will in 1985, however, New Jersey required that all wills and codicils be signed by the decedent.[23] Contrary to Delaware, however, New Jersey did not require that all wills and codicils be witnessed.[24] Therefore, her signed holographic Will satisfied the then-extent New Jersey requirements. By contrast, the Codicil did not comply with New Jersey law at the time it was created because New Jersey law required codicils to be signed until February 27, 2005—a time when Bernice was living in Delaware and nearing her death. Nonetheless, the relevant New Jersey statute was amended before Bernice's death and by the terms of its effective date would

will; (2) a partial or complete revocation of the will; (3) an addition to or an alteration of the will; or (4) a partial or complete revival of his formerly revoked will or of a formerly revoked portion of the will. N.J. Stat. Ann. § 3B:3–3.

19. N.J. Stat. Ann. § 3B:3–3; *see also In re Estate of Denner,* 2006 WL 510530, at *2–4 (N.J.Super.Ct. Ch.Div. Feb. 28, 2006) (denying motion to dismiss that asserted that even under the revised § 3B:3–3 a will must be signed in order to be probated).

20. *See* 2004 N.J. Sess. Law Serv., ch. 132 (West) (explaining that the New Jersey act was revised at least in part to "clarif[y] situations where writings that are intended as wills would be allowed" even if missing certain formalities); *see also* Restatement (Third) of Property: Wills & Other Donative Transfers § 3.3, comments a & b (2006) (endorsing "intent-serving" rules designed to excuse non-compliance with testamentary formalities as "harmless errors" where clear and convincing evidence of testamentary intent is present); John H. Langbein, *Substantial Compliance with the Wills act,* 88 Harv. L.Rev. 489, 531 (1975) (article by a leading scholar whose view that a "substantial compliance doctrine" should replace the "literal compliance doctrine" has gained many adherents in the thirty years since the article's publication).

21. *See* 6 *Del. C.* § 2714(a) ("No action shall be brought to charge any person upon any agreement made ... upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by the party lawfully authorized in writing...."); *Shepherd v. Mazzetti,* 545 A.2d 621, 623 (Del.1988) ("One well-rooted exception to the absolute command of the general statute of frauds controlling contracts, see 6 *Del.C.* § 2714(a), is the equitably-derived principle that a partly performed oral contract may be enforced ... upon proof by clear and convincing evidence of actual part performance.").

22. *See* 2004 N.J. Sess. Law Serv., ch. 132, §§ 10 & 95 (West) (amending New Jersey's probate code as of August 31, 2004 with an effective date 180 days thereafter).

23. *See* N.J. Stat. Ann. §§ 3B:3–2 & 3B:3–3 (1985) (requiring all wills, including holographic wills, to be signed to be valid); *see also* N.J. Stat. Ann. § 3B:1–2 (including codicils within the statutory definition of a "will").

24. *See* N.J. Stat. Ann. § 3B:3–3 (1985) (recognizing holographic wills as valid without attestation by witnesses).

operate to validate the Codicil if Bernice were a New Jersey resident as of the time of her death and her estate were being probated in that state.[25]

The problem for respondent Gornik is that Bernice died a Delaware resident and her estate is being administered in this court. As such, the Codicil would be invalid if it had been executed in Delaware because it was not signed by Bernice and properly witnessed.[26] Title 12 of the Delaware Code, entitled "Decedents' Estates and Fiduciary Relations," provides the requirements for a valid will in § 202, which plainly states:

(a) Every will, whether of personal or real estate, must be:

(1) In writing and signed by the testator or by some person subscribing the testator's name in the testator's presence and by the testator's express direction; and

(2) Subject to § 1306 of this title, attested and subscribed in testator's presence by 2 or more credible witnesses.

(b) Any will not complying with subsection (a) of this section shall be void.[27]

Under § 202, the Codicil is plainly void as it was neither signed as required by § 202(a) nor witnessed as required by § 202(b). Therefore, Gornik must rest his motion on the Delaware statute, 12 Del. C. § 1306, which permits the validation of wills that do not comply with the formalities specified in § 202 in defined circumstances. Section 1306, which is referenced

in § 202(b), is captioned "Choice of law as to execution of wills," and provides:

A written will *signed by the testator*, or by some person subscribing the testator's name in the testator's presence and at the testator's express direction, is valid if executed in compliance with § 202 of this title or if its execution complies with the law at the time of execution of the place where the will is executed, or of the law of the place where at the time of execution or at the time of death the testator is domiciled, has a place of abode or is a national.[28]

Gornik channels the spirit of § 1306's authors and would have me believe that their primary intent was to make sure that the testamentary wishes of a testator are honored so long as her will would be recognized as valid now by the law of the place where "at the time of execution or at the time of death the testator is domiciled, has a place of abode or is a national." [29] Because Bernice was a New Jersey resident at the time she executed the Will and Codicil, Gornik contends that the General Assembly, by mandate of § 1306, would want the Codicil enforced. In support of that contention, Gornik essentially argues that Delaware is a progressive state that would want to validate wills so long as they comply with the law of a place having one of the connections with the testator specified in § 1306. To him, it works an inexplicable result to have Delaware refuse to recognize the validity of a codicil executed in New Jersey by a then-New Jersey resi-

---

**25.** Thus, the petitioners have dropped their argument that even if the newly-enacted New Jersey statutes would save a writing like the Codicil, that law could not be applied retroactively to validate the Codicil at issue here. *See* Transcript of Oral Argument (Apr. 9, 2007) at 42–44 (dropping the allegation of retroactive application of the New Jersey statute "unequivocally").

**26.** *E.g., Matter of Will of Carter*, 565 A.2d 933, 936 (Del.1989); *In re Panousseris' Will*, 151 A.2d 518, 523 (Del. Orphans' Ct.1959).

**27.** 12 *Del. C.* § 202.

**28.** 12 *Del. C.* § 1306 (emphasis added).

**29.** *Id.*

dent when New Jersey law would recognize that codicil as valid.

As the petitioners point out, the problem with Gornik's argument is that its acceptance requires a judicial willingness to ignore the plain language of the statute. By its clear terms, the statute says that a "written will signed by the testator, or by some person subscribing the testator's name in the testator's presence and at the testator's express direction is valid if" certain conditions are met.[30] The "what" that may be validated is a "will signed by the testator" or by someone with authority to sign for the testator. Summarized in categorical terms, the statute as a general rule can be read to state:

A written will signed by the testator ... is valid if[:]

▇ executed in compliance with § 202 of this title, or

▇ if its execution complies with[:]

[a.] the law at the time of execution of the place where the will is executed, or

[b.] of the law of the place where at the time of execution or at the time of death the testator is domiciled, has a place of abode or is a national.[31]

The structure of § 202 also reinforces this clear reading. Specifically, § 202 is structured such that a will is only valid if it complies with subsection (a) *and* subsec-

tion (b). Thus, § 202 requires that a will be "[i]n writing and signed by the testator" as mandated by § 202(a) regardless of whether it might be valid in another jurisdiction as permitted by the reference in § 202(b) to § 1306.[32]

From the plain terms of these statutes, the General Assembly's intent is clear. It was willing to give effect to signed wills so long as the law of some relevant jurisdiction would do so, even when that meant that the will was signed without the strict formalities contemplated by our law. But the General Assembly drew the line at the signature requirement, refusing to relax that requirement in a statute— § 1306— that otherwise reflects the intention to have this court apply the law of other jurisdictions when that is necessary to validate a testator's will.

Gornik admits that the "language of § 1306, read literally, appears to require a signature." [33] That admission was a compulsory one as there is no lack of clarity about that section's language. Thus, because § 1306 has only one plausible reading, the duty of this court is to enforce the statute as written.[34]

Gornik may believe it would be better policy to relax the formality of an independent signature requirement in § 1306, and he can cite to learned scholars whose writings buttress that view.[35] But he is ad-

---

30. *Id.*

31. *Id.*

32. 12 *Del. C.* § 202.

33. Respondent's Reply Brief at 7.

34. *See Newtowne Village Service Corp. v. Newtowne Road Development Company, Inc.,* 772 A.2d 172, 175–76 (Del.2001) ("When the language and intent of a statute are clear, no ambiguity exists and the Court will not engage in construing or interpreting the statute.").

35. *See, e.g.,* Mary Louise Fellows & Gregory S. Alexander, *Forty Years of Codification of Estates and Trusts Law: Lessons for the Next Generation,* 40 GA. L.REV. 1049, 1063–64 (2006) (arguing that codification of intent-defeating rules ignores the intent-furthering traditions of estates and trust laws and could stunt doctrinal development in the field); John H. Langbein, *Excusing Harmless Errors in the Execution of Wills: A Report on Australia's Tranquil Revolution in Probate Law,* 87 COLUM. L.REV. 1, 4 (1987) (arguing for the adoption of a harmless error rule and a focus on the decedent's testamentary intent to avoid

dressing his argument to the wrong branch of government. I cannot accept his invitation to become a de facto member of the General Assembly and rewrite the Delaware Code. Rather, "it is the Legislature and not the Judiciary who must initiate ... change in the statute and enunciate the statutory provisions."[36] By enacting §§ 202 and 1306 of Title 12 of the Delaware Code in 1974, the General Assembly set forth a clear mandate that a signature is required for a will to be given effect in our courts.[37] Although much has changed in the three decades since those statutes were enacted, the General Assembly has never seen fit to substantively change them.[38]

Recognizing that § 1306 is clear on its face, Gornik falls back on the argument that the statute produces "an unreasonable and absurd result" in this case.[39] That result, Gornik argues, is the conversion of an intent-serving statute designed to recognize the validity of wills executed in accordance with the laws of other jurisdictions into an intent-defeating obstacle that would frustrate planned testamentary dispositions.

■ This argument is unavailing. For starters, Gornik is trying to invoke a narrow and delicate interpretive maxim—the so-called "absurdity doctrine"—in circumstances in which it does not pertain. The absurdity doctrine is most appropriately and responsibly invoked only when a statute's words may be read in two plausible ways. In those cases, courts have considered the practical consequences of each reading as a factor in deciding which interpretation was intended by the legislature.[40] In that process, courts have eschewed an interpretation if it would lead to so-called "absurd" results, on the ground that the legislature must not have intended the statute to produce "unreasonable" results.[41] But, even then, that interpretative exercise is a very sensitive one that can be subject to (conscious or unconscious) abuse, as it provides room for the judiciary to give license to its own sense of appropriate public policy outcomes, by labeling out-

---

much of the hardship associated with strict compliance with testamentary formalities).

**36.** *Allstate Erectors, Inc. v. Boshell,* 301 A.2d 316, 318 (Del.Super.1972), *aff'd,* 305 A.2d 619 (Del.1973) ("The Law, clear and unambiguous on its face, may not be enlarged by judicial interpretation.").

**37.** *In re Panousseris' Will,* 151 A.2d 518, 523 (Del. Orphans' Ct.1959) (setting forth the required testamentary formalities and stating that a "court has no power to substitute its judgment for that of the legislature as to the essentials of a will").

**38.** The only revision to these sections has been a gender neutrality law that clarifies that the term "testator" refers to both men and women. Del. S.B. 221, 138th Leg., 1st Sess., 70 Del. Laws, ch. 186, § 1 (1995); *see also* Del. S.B. 450, 127th Leg., 2nd Sess., 59 Del. Laws, ch. 384, §§ 1–3 (1974) (enacting §§ 202 and 1306 of Title 12).

**39.** Respondent's Reply Brief at 7.

**40.** *E.g., Tomei v. Sharp,* 902 A.2d 757, 768–69 (Del.Super.2006), *aff'd,* 918 A.2d 1171, 2007 WL 249176, at *2–3 (Del.2007) (looking to legislative intent in determining that the ambiguous term "employer" in the Delaware Whistleblowers' Protection Act applied only to current employers, not all prior or subsequent employers because such a broad interpretation would work an unreasonable and absurd result).

**41.** *See Daniels v. State,* 538 A.2d 1104, 1109–10 (Del.1988) ("What has been described as the 'golden rule' of statutory construction provides that the unreasonableness of the result produced by one among alternative interpretations of a statute is just cause for rejecting that interpretation in favor of the interpretation that would produce a reasonable result.").

comes it finds disquieting as "absurd" or "unreasonable."

Admittedly, courts, including the Delaware Supreme Court and the United States Supreme Court, have invoked the absurdity doctrine when interpreting statutes that are clear on their face.[42] In a situation when a statute's language may be plausibly read in only one manner, the most persuasive justification for the doctrine's use is that it serves to expose and correct statutory drafting errors.[43] The inference is that if a statute produces results that are so at odds with accepted public policy and fundamental fairness, its drafters must have committed a scrivener's error in committing the legislature's intentions to paper.[44]

Although the use of the absurdity doctrine in this context has also been explained as a tool for finding textual ambiguity,[45] that explanation tends to obscure just how powerful the doctrine is and how it can be misused.[46] If a statute cannot, as a textual matter, be read in two reasonable

---

**42.** *E.g., Church of the Holy Trinity v. U.S.,* 143 U.S. 457, 465, 12 S.Ct. 511, 36 L.Ed. 226 (1892) (holding that although the Alien Contract Labor Act made it a crime to contract with or encourage any alien to migrate to the United States "to perform labor or service of any kind," a cleric who emigrated from England to serve as a pastor of a New York church and thus technically fell within the letter of the Act, was exempt from the Act's reach because of the absurd results that would follow from giving such broad meaning to words of the statute); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* 492 A.2d 1242, 1246–47 (Del.1985) (rejecting a literal construction of the Coastal Zone Act, which was enacted to "protect the natural environment of [Delaware's] bay and coastal areas" by regulating bulk transfer facilities on the waterways, but would have produced the "irrational and absurd result of prohibiting only those facilities for the transfer of substances from vessel to an onshore facility or vice versa, regardless of the potential threat of pollution and industrialization to the Delaware Coast").

**43.** *E.g., Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 202–03, 4 L.Ed. 529 (1819) (Marshall, C.J.); *see also U.S. v. X–Citement Video, Inc.,* 513 U.S. 64, 82, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (Scalia, J., dissenting) ("I have been willing, in the case of civil statutes, to acknowledge a doctrine of "scrivener's error" that permits a court to give an unusual (though not unheard-of) meaning to a word which, if given its normal meaning, would produce an absurd and arguably unconstitutional result."); *Union Bank v. Wolas,* 502 U.S. 151, 163, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (Scalia, J., concurring) ("Since there was here no contention of a 'scrivener's error' producing an absurd result, the plain text of the statute should have made this litigation unnecessary and unmaintainable.").

**44.** *See* John F. Manning, *The Absurdity Doctrine,* 116 HARV. L.REV. 2387, 2389–90 (2003) ("Congress does not always accurately reduce its intentions to words because legislators necessarily draft statutes within the constraints of bounded foresight, limited resources, and imperfect language. The absurdity doctrine builds on that idea: If a given statutory application sharply contradicts commonly held social values, then the Supreme Court presumes that this absurd result reflects imprecise drafting that Congress could and would have corrected had the issue come up during the enactment process.").

**45.** *E.g., Newtowne Village Service Corp. v. Newtowne Road Development Company, Inc.,* 772 A.2d 172, 175–76 (Del.2001) ("A statute will be considered ambiguous when it is reasonably susceptible of different conclusions or interpretations. Ambiguity may also be found if a literal reading of the statute would lead to an unreasonable result.").

**46.** *Magill v. North American Refractories Co.,* 128 A.2d 233, 236 (Del.1956) (recognizing that because the absurdity doctrine can overturn clear statutes, it must be "cautiously applied."); *see also X–Citement Video,* 513 U.S. at 82, 115 S.Ct. 464 (Scalia, J., dissenting) ("[T]he *sine qua non* of any 'scrivener's error' doctrine, it seems to me, is that the meaning genuinely intended but inadequately expressed must be absolutely clear; otherwise we might be rewriting the statute rather than correcting a technical mistake.").

ways, it is not ambiguous in the sense that the words themselves are unclear. The fact that the statute's only reading produces what the court concludes are absurd results does not change that. It does, however, raise an inference that the legislative drafters failed to codify their true intent and license the court to search beyond the statutory text for evidence of what that intent was. Rather obviously, a judicial decision to refuse to give effect to the only textually-reasonable reading of a statute's words on the grounds that enforcement would work absurd results requires the judiciary to surface and give effect to its own perspective on public policy in a way that risks intrusion on the legislative function.[47] Such decisions, if they are to be made, are therefore best done straightforwardly as an exercise in determining that the legislature could not have intended what it said, rather than in saying that what it said was not clear.[48] The uncomfortable nature of such an analysis actually has a salutary effect, as it

operates as a goad to sparing and responsible use of this narrow interpretative doctrine.[49]

Here, Gornik has not shown that § 1306 produces absurd results. To begin with, it is by no means irrational for the General Assembly to have believed that a document as important as a will should be signed. Given that testators are by conventional definition unavailable to testify about their intentions as to the will being proffered as representing their desires, the General Assembly may have considered it a minimal requirement that it be shown that the will was at least signed by the testator.[50]

What is notable, though, is that the General Assembly had the option of adopting a choice of law provision that did not include a bottom-line signature requirement. Five years before the General Assembly's enactment of Title 12, the Uniform Probate Code of 1969 ("UPC 1969")

---

**47.** *See Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 441, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (noting that statutes are often delicately crafted in a process of legislative compromise and rejecting application of an absurd results test to alter an unambiguous statute in order to satisfy policy preferences better fought out in other arenas); *Public Citizen v. U.S. Dept. of Justice,* 491 U.S. 440, 470–71, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring) ("When used in a proper manner, this narrow exception to our normal rule of statutory construction does not intrude upon the lawmaking powers of Congress, but rather demonstrates a respect for the coequal *Legislative Branch, which we assume would not act in an absurd way.* This exception remains a legitimate tool of the Judiciary, however, only as long as the Court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone.").

**48.** *E.g., Dir. of Revenue v. CNA Holdings, Inc.,* 818 A.2d 953, 958 (Del.2003) (exemplifying such a straightforward analysis by stating: "Even though the language of the statute is plain and unambiguous, we must decide whether a literal reading of [the statute] leads to an unreasonable result.").

**49.** *See Home Insurance Co. v. Maldonado,* 515 A.2d 690, 693–95 (Del.1986) (recounting the Delaware Supreme Court's unwillingness to declare the first version of our state's uninsured motor vehicle law "absurd" even though the court considered the result of its clear statutory language—that an injured person was in a better position when harmed by an uninsured driver than by a driver carrying the statutory minimal level of insurance—"illogical and unfair" and "poor public policy").

**50.** *See Matter of Will of Carter,* 565 A.2d 933, 936 (Del.1989) ("[F]ull compliance with statutory requirements for the execution of wills is necessary to minimize fraud or other improprieties, particularly after the testator's lips are sealed by death or incapacity.")

was issued. As the Delaware Code illustrates, our General Assembly has often drawn upon the work of the Uniform Laws Commission as a source of guidance about possibly useful evolutions in our statutory law.[51] But, in crafting §§ 202 and 1306 of Title 12, the General Assembly diverged from the language of the model law in two important ways. First, § 1306 of the Delaware Code starts with the phrase "[a] written will *signed by the testator* ... is valid if,"[52] which adds the "signed by the testator" to the otherwise analogous choice of law provision of UPC 1969, which begins "[a] written will is valid if" but contains no requirement for a signature.[53] By additional contrast, Delaware's § 202 plainly requires that every will must be "[i]n writing and signed by the testator" *and* either be attested by two witnesses or comply with § 1306, the

choice of law provision,[54] while the comparable section of UPC 1969 does not subject wills falling within the ambit of the act's choice of law section to an independent signature requirement.[55] Thus, by adopting language distinct from the model act, the General Assembly manifested the importance it placed on the formality of a testator's signature on her purported will.

In this regard, it is notable that New Jersey was hardly part of a state law stampede when it recently revised its law to eliminate a strict signature requirement.[56] Although there has been scholarly support for changes of the kind New Jersey made for some time and even though the UPC was itself amended in 1990 to provide for a harmless error provision analogous to that which New Jersey later adopted,[57] only a very few states

---

**51.** By way of example, the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17–101, *et seq.*, is modeled on the Revised Uniform Limited Partnership Act, *see Hillman v. Hillman*, 910 A.2d 262, 271 (Del.Ch.2006) ("[T]he DRULPA was drawn, initially, from the 1976 Revised Uniform Limited Partnership Act, and in its current form is drawn from the 1985 version of the Revised Uniform Limited Partnership Act."), and the Delaware Uniform International Wills Act, 12 *Del. C.* § 251, *et seq.*, derives from the Uniform International Wills Act, *see* Del. S.B. 161, 139th Leg., 1st Sess., 71 Del. Laws, ch. 81 (1997) ("This Act contains the Uniform International Wills Act, which was proposed and approved by the National Conference of Commissioners on Uniform State Laws.").

**52.** 12 *Del. C.* § 1306 (emphasis added).

**53.** UPC 1969 § 2–506.

**54.** 12 *Del. C.* § 202(a).

**55.** Section 2–502 of UPC 1969 provides:

Except as provided for holographic wills, writings within Section 2–513 [incorporated writings], and wills within Section 2–506 [choice of law], every will shall be in writing signed by the testator or in the testator's name by some other person in the testator's

presence and by his direction, and shall be signed by at least 2 persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will.

UPC 1969 § 2–502.

**56.** *See* Fellows & Alexander, 40 Ga. L.Rev. at 1063 n. 51 (citing only six other states that have adopted statutes similar to New Jersey's § 3B:3–3).

**57.** The amendment to the UPC in 1990 ("UPC 1990") combined UPC 1969 §§ 2–502 and 2–503 into one section—UPC 1990 § 2–502, which provides:

(a) Except as provided in subsection (b) and in Sections 2–503, 2–506, and 2–513, a will must be:
(1) in writing;
(2) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and by the testator's direction; and
(3) signed by at least two individuals, each of whom signed within a reasonable time after he [or she] witnessed either the signing of the will as described in paragraph (2) or the testator's acknowledgment of that signature or acknowledgment of the will.

have adopted that model rule.[58] Additionally, at least one state that has adopted a version of the UPC 1990 harmless error rule made clear that it still considered a signature to be an essential testamentary formality.[59] Upon such a backdrop, it would be intellectually arrogant to deem the General Assembly's continued insistence on a signature as an irreducible prerequisite to giving effect to a will to be an unprincipled stubbornness that produces absurd results. In that respect, it bears emphasis that Bernice herself could not have taken comfort in the absence of a signature requirement at the time she drafted the Codicil, as it is clear that New Jersey law required a signature as of the date she crafted that document [60] and it is equally undisputed that Bernice went to her grave unaware of the recent amendments to New Jersey law.[61]

Of course, it could be that this very case stimulates the General Assembly to amend §§ 202 and 1306 in the manner Gornik believes is advisable. But it is vital that that sort of evolution emanate from the branch elected by the people to make the laws, not from an unelected judge. When judges refuse to give effect to clearly written statutes requiring formalities in certain types of legal instruments because they do not like the result produced in a

---

(b) A will that does not comply with subsection (a) is valid as a holographic will, whether or not witnessed, if the signature and material portions of the document are in the testator's handwriting.

(c) Intent that the document constitute the testator's will can be established by extrinsic evidence, including, for holographic wills, portions of the document that are not in the testator's handwriting.

UPC 1990 § 2–502. Following that section, UPC 1990 added a harmless error provision as a new § 2–503. That provision reads:

Although a document or writing added upon a document was not executed in compliance with Section 2–502, the document or writing is treated as if it had been executed in compliance with that section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute (i) the decedent's will, (ii) a partial or complete revocation of the will, (iii) an addition to or an alteration of the will, or (iv) a partial or complete revival of his [or her] formerly revoked will or of a formerly revoked portion of the will.

UPC 1990 § 2–503.

**58.** *See, e.g.,* Haw.Rev.Stat. § 560:2–503 (2006); Mich. Comp. Laws Ann. § 700.2503 (West 2006); Mont.Code Ann. § 72–2–523 (2006); N.J. Stat. Ann. § 3B:3–3 (2006); S.D. Codified Laws § 29A–2–503 (2006); Utah Code Ann. § 75–2–503 (2006).

**59.** The relevant Colorado statute states:

Subsection (1) of this section [which is identical to UPC 1990 § 2–503] shall apply only if the document is signed or acknowledged by the decedent as his or her will or if it is established by clear and convincing evidence that the decedent erroneously signed a document intended to be the will of the decedent's spouse.

Colo.Rev.Stat. § 15–11–503(d)(2). The limited exception to the signature requirement for "switched-will" cases in Colorado might be inspired by the scholarship of John Langbein who recognized that the presence of a "[s]ignature is the formality that permits us to distinguish between drafts and wills" but supported recognition of switched wills because the act of signing indicated that the act was "purposive." *See* Langbein, 87 Colum. L.Rev. at 23–27 (expressing reservations about validating an unsigned will where there may have been possible explanations for the failure to execute the will other than mere inadvertence).

**60.** At that time, New Jersey had adopted a version of UPC 1969, which did not contain an analog to the current New Jersey harmless error provision codified at § 3B:3–3.

**61.** *See* Transcript of Oral Argument (Apr. 9, 2007) at 15–16 (reflecting Gornik's counsel's acknowledgment that it was incredibly unlikely that the decedent "knew anything about the choice of law statute" and recognizing that the amendment of the New Jersey statutes was a "fortuitous change").

particular case, they undermine the useful systemic effects those requirements have in facilitating the reliable, non-disputatious handling of important matters and put the General Assembly in the awkward position of having to legislate on a "yes, we really meant it" basis. More generally, such action undermines our constitutional order and dilutes the authority and concomitant accountability to the citizenry that the legislative branch should have for legislation it adopts.[62]

## IV. *Conclusion*

For the foregoing reasons, Respondent Joseph Gornik's motion for summary judgment is denied. IT IS SO ORDERED.

---

**62.** This court's role in that constitutional order is limited to construing the statutes passed by the legislature with the "predominant goal of statutory construction [being] 'to ascertain and give effect to the intent of the legislature.'" *See Weiss v. Weiss,* 2007 WL 522290, at *3 (Del.Ch.2007) (quoting *Rubick v. Security Instrument Corp.,* 766 A.2d 15, 18 (Del.2000)).