## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| AG MOBILE HOLDINGS, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2023-1103 MAA |
| | ) |
| H.I.G. MOBILE, L.P., MATRIX | ) |
| TOPCO, L.P., MATRIX TOPCO GP, | ) |
| LLC, H.I.G. TECHNOLOGY | ) |
| PARTNERS, LLC, NISHANT | ) |
| NAYYAR, ALEXANDER THORN, | ) |
| and GAVIN PATTERSON, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Submitted: November 13, 2024
Decided: February 13, 2025

*Upon Defendants' Motion to Dismiss:*
**GRANTED in Part, and DENIED in Part.**

### MEMORANDUM OPINION

Kevin R. Shannon, Esquire, Christopher N. Kelly, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, DE, and Kevin B. Huff, Esquire (Argued), David L. Schwarz, Esquire, and Aaseesh P. Polavarapu, Esquire of KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, DC, Attorneys for *Plaintiff AG Mobile Holdings, L.P.*

Daniel M. Kirshenbaum, Esquire, and Michael A. Laukaitis, II, Esquire, of YOUNG, CONAWAY, STARGATT, and TAYLOR LLP, Wilmington, DE, and Michael S. Shuster, Esquire (Argued), Vincent Levy, Esquire, Jessica Marder-Spiro, Esquire, and Rashelle R. James, Esquire of HOLWELL SHUSTER & GOLDBERG LLP,

New York, NY, *Attorneys for Defendants H.I.G. Mobile, L.P., Matrix Topco, L.P., Matrix Topco GP, LLC, H.I.G. Technology Partners, LLC, Nishant Nayyar, and Alexander Thorn.*

Adam K. Schulman, Esquire of ABRAMS & BAYLISS LLP, Wilmington, DE, *Attorney for Defendant Gavin Patterson*.

**Adams, J.[1]**

---

[1] Sitting as a Vice Chancellor of the Court of Chancery of the State of Delaware by designation of the Chief Justice of the Supreme Court of Delaware pursuant to *In re: DESIGNATION OF THE HONORABLE Meghan A. Adams* under Del. Const. art. IV § 13(2) dated November 15, 2023.

# I. INTRODUCTION

This action arises out of the sale and subsequent management of Mobileum, Inc. ("Mobileum"). Non-party Audax Management Company, LLC ("Audax") sold a controlling interest in Mobileum, through Audax's subsidiary, Plaintiff AG Mobile Holdings, L.P. ("Plaintiff"), to Defendant H.I.G. Mobile, L.P. ("H.I.G."), while retaining a significant minority stake (the "Transaction"). H.I.G. and Plaintiff formed Defendant Matrix Topco, L.P. (the "Partnership") to own and operate Mobileum pursuant to the parties' Limited Partnership Agreement (the "Partnership Agreement"). Under the Partnership Agreement, Defendant Matrix Topco GP, LLC ("Matrix Topco GP") was formed to serve as the Partnership's General Partner.

Over a year after the Transaction closed, the Partnership's board (the "Board") formed a Special Committee – consisting of Defendant directors Nishant Nayyar ("Nayyar"), Alexander Thorn ("Thorn"), and Gavin Patterson ("Patterson," collectively with Nayyar and Thorn, the "Individual Defendants") – to investigate alleged accounting irregularities at Mobileum before the Transaction (the "Investigation"). The Investigation resulted in H.I.G. filing a lawsuit in the Superior Court alleging Audax fraudulently induced H.I.G. to enter into the Transaction (the "Fraud Suit").[2]

---

[2] *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super.).

The Fraud Suit prompted Plaintiff to file this action, alleging H.I.G., related entity Defendant H.I.G. Technology Partners, LLC ("H.I.G. Tech"), the Partnership, Matrix Topco GP, and the Individual Defendants breached the Partnership Agreement through their conduct during the Investigation. Plaintiff's amended complaint also asserts a claim for breach of the implied covenant of good faith and fair dealing against all Defendants. In the alternative to its breach of contract claims, Plaintiff alleges the Individual Defendants tortiously interfered with the Partnership Agreement.

Defendants seek dismissal of all counts (the "Motion"). Defendants make three general arguments supporting their Motion. First, Defendants contend they are insulated from liability for any alleged breach of the Partnership Agreement. Second, Defendants argue each count brought by Plaintiff should be dismissed for failure to state a claim. Finally, Defendants assert Plaintiff failed to plead any recoverable damages. For the reasons discussed below, the Court **GRANTS** in part, and **DENIES** in part, the Motion.

## II.  BACKGROUND[3]

### A. The Parties and Relevant Non-Parties

Plaintiff is a Delaware limited partnership with its principal place of business in Boston, Massachusetts.[4]  Plaintiff is "an investment entity affiliated with funds managed by" non-party Audax, a middle-market investment firm.[5]  Plaintiff is a Limited Partner in the Partnership and a signatory of the Partnership Agreement.[6]

Defendant H.I.G. is a Delaware limited partnership with its principal place of business in New York, New York.[7]  H.I.G. is a Limited Partner in the Partnership and signatory of the Partnership Agreement.[8]  Similarly, Defendant Matrix Topco GP is a Delaware limited liability company with its principal place of business in New York, New York.[9]  Matrix Topco GP serves as the Partnership's General Partner and is a signatory to the Partnership Agreement.[10]  Defendant H.I.G. Tech is a Delaware limited liability company with its principal place of business in Miami,

---

[3] The facts incorporated herein are drawn from Plaintiff's Verified Amended and Supplemental Complaint (D.I. 24) (hereinafter "Compl.") and the documents incorporated therein.  The Court accepts the well-pled facts in the Amended Complaint as true solely for the purpose of resolving the Motion.
[4] Compl. ¶ 18.
[5] *Id.*
[6] *Id.*
[7] *Id.* ¶ 19.
[8] *Id.*
[9] *Id.* ¶ 21.
[10] *Id.*

Florida.[11]  H.I.G. Tech is a "Special Limited Partner" of the Partnership and a party to the Partnership Agreement.[12]

Defendant the Partnership is a Delaware limited partnership with its principal place of business in New York, New York.[13]  The Partnership "indirectly owns a 100 percent interest in non-party Mobileum[.]"[14]  The Individual Defendants are members of the Partnership's Board, and each were "appointed by H.I.G. to serve as one of its representatives."[15]  The Individual Defendants were each members of the Special Committee that led the Investigation at the center of this litigation.[16]

## B. Audax Buys, Operates, and Sells, Mobileum

In November 2016, Audax acquired Mobileum.[17]  Over the next five years, Mobileum grew through a series of acquisitions and expansions into new markets and product lines.[18]  After driving this growth, Audax sought to sell a majority stake in Mobileum while "retain[ing] a significant minority interest with the right buyer so that it could continue to reap the upside of its initial investment[.]"[19]

---

[11] *Id.* ¶ 22.
[12] *Id.*
[13] *Id.* ¶ 20.
[14] *Id.*
[15] *Id.* ¶¶ 24-26.
[16] *Id.*
[17] *Id.* ¶ 33.
[18] *Id.* ¶¶ 35-38.
[19] *Id.* ¶¶ 39-43.

In December 2021, Audax sold a controlling interest in Mobileum to H.I.G.[20] As part of the Transaction, Audax "rolled over approximately $100 million" into Mobileum, giving it a roughly 23.5 percent stake, and H.I.G. a 66.9 percent stake, in the new Partnership.[21] The Transaction closed in March 2022.[22]

## C. The Partnership Agreement

As part of the Transaction, the parties thereto entered into the Partnership Agreement "[t]o govern their partnership in [Mobileum]."[23] Several provisions of the Partnership Agreement are relevant here.

Section 2.4 states the Partnership's purpose is to "invest in Matrix Holdco, Inc.," the direct parent of the entity "which purchased the majority stake in Mobileum."[24]

Article VI of the Partnership Agreement details the "Management of the Partnership."[25] Section 6.1 gives the Board the authority to manage the Partnership, stating:

> all powers of the Partnership shall be exercised by or under the authority of, and the business and affairs of the Partnership shall be managed by and under the direction of, the Board (to which the General Partner hereby irrevocably delegates all of its rights and powers under the Act pursuant to Section 17-403(c) thereof), and the Board shall

---

[20] *Id.* ¶ 44.
[21] *Id.* According to the Amended Complaint, "Management and the Board held a 9.6 percent stake." *Id.*
[22] *Id.*
[23] *Id.* ¶ 45.
[24] *Id.* ¶ 46; Compl., Ex. A (hereinafter "Partnership Agreement") § 2.4.
[25] Partnership Agreement Article VI.

make all decisions and take all actions for the Partnership which are necessary or appropriate to carry out the Partnership's business[.][26]

Section 6.3 empowers the Board to create committees and provides

The Board may designate one (1) or more committees of the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required. H.I.G. Managers shall not constitute less than a majority of any committee of the Board without the prior written consent of H.I.G. For so long as Audax is entitled to appoint at least one Audax Manager pursuant to Section 6.2, each committee of the Board shall have at least one (1) Audax Manager.[27]

Section 6.12 and 6.13 "articulated the parties' intent to collaborate on Board-level decisions."[28] While those provisions allowed H.I.G. to cast the majority vote on any Board matter through its appointed managers, "[e]ach Other Manager shall be entitled to one (1) vote upon any matter submitted to a vote[.]"[29]

Section 8.17 of the Partnership Agreement details H.I.G. and its subsidiaries' ability to transact with the Partnership.[30] Specifically, Section 8.17 provides, in relevant part:

Notwithstanding that it may constitute a conflict of interest, [H.I.G.] or their Affiliates may engage in any transaction . . . with the Partnership and/or its Subsidiaries so long as [sic] (i) such transaction is approved by Managers holding a majority of the votes of all disinterested Managers then serving on the Board, (ii) such transaction is on arms' length terms or terms no less favorable to the Partnership and/or its Subsidiaries than those available from a third party, as determined in good faith by the Board, or (iii) the Board has obtained a written

---

[26] *Id.* § 6.1.
[27] *Id.* § 6.3 (underlying in original).
[28] Compl. ¶ 49.
[29] Partnership Agreement § 6.12; *see* Compl. ¶ 49; Partnership Agreement § 6.13.
[30] Partnership Agreement § 8.17.

opinion from an independent valuation, investment banking or financial advisory firm, that the consideration payable in, or other principal financial terms, as applicable, of, such transaction are fair, from a financial point of view, to the holders of Class A Common Units other than, if applicable based on the nature of the transaction, H.I.G.[31]

The Partnership Agreement also discusses the potential liability of managers and partners. Section 6.17 absolves any "Manager, General Partner or Related Persons of the foregoing," of "any liability for breach of duty (including fiduciary duty)[.]"[32] While the Partnership Agreement waives any fiduciary duty claims, it obligates "the Board or the General Partner . . . to take any action or to make a decision in its 'good faith.'"[33] Section 3.2 absolves the Limited Partners of any personal liability for the Partnership's debts or obligations, stating:

> Except as expressly set forth in this Agreement, the Act or a contractual liability agreed to by a Partner or other Holder, no Limited Partner or other Holder shall have any personal liability whatsoever in his, her or its capacity as a Limited Partner or Holder, whether to the Partnership, to any of the other Partners or Holders, to the creditors of the Partnership or to any other third party, for the debts, liabilities, commitments or any other obligations of the Partnership or for any losses of the Partnership, and therefore each Limited Partner or other Holder shall be liable only to make such Person's required Capital Contribution to the Partnership and the payments provided in Section 3.2(c) below. Each Partner hereby consents to the exercise by the Board, the General Partner and the Partnership's officers of the powers conferred on them by this Agreement.[34]

---

[31] *Id.*
[32] *Id.* § 6.17(d).
[33] *Id.* § 6.17(c).
[34] *Id.* § 3.2(a) (underlying in original).

9

Also relevant here, Section 11.2 of the Partnership Agreement details the information rights of the various entities affiliated with the Partnership.[35]  Section 11.2(a) requires the Partnership to "deliver to each Manager periodic financial statements, annual audited financial statements, and annual budgets and other financial reports requested by the Board."[36]  Section 11.2(c) details Plaintiff's right to access various financial documents including monthly, quarterly, and annual financial statements, as well as the annual approved budget.[37]

**D. Post-Closing Partnership Management Issues and the Investigation**

After the Transaction, Mobileum's business steadily declined.[38]  Plaintiff argues this was due to poor management decisions by H.I.G., through its Board Managers, including micromanagement, firing key executives, and destroying customer relationships.[39]  Plaintiff alleges while making these poor choices, H.I.G. "exclude[d] [Plaintiff] and the Audax Managers from many key decisions."[40]

One such Board decision Plaintiff challenges is the formation of the Special Committee to conduct the Investigation.[41]  On June 14, 2023, two of H.I.G.'s Board representatives – Defendants Nayyar and Thorn – announced the Board "had

---

[35] *See id.* § 11.2.
[36] *Id.* § 11.2(a).
[37] *Id.* § 11.2(c).
[38] Compl. ¶ 60.
[39] *Id.* ¶¶ 60-77.
[40] *Id.* ¶¶ 78-80.
[41] *See id.* ¶¶ 82-83.

established a Special Committee . . . to investigate alleged but unspecified accounting irregularities."[42] The Special Committee consisted of the Individual Defendants and "hired outside counsel" "before its formal creation."[43] The Special Committee's creation and its hiring of counsel were "done without Board approval, or even awareness."[44] Consequently, Plaintiff "demanded that its designated manager be appointed to the Special Committee as required by Section 6.3. [But] H.I.G. and the Individual Defendants refused."[45]

The Special Committee's stated purpose was to investigate accounting irregularities.[46] Plaintiff, however, alleges the Investigation "was designed not to get to the truth, but rather to benefit H.I.G. and falsely accuse Audax of impropriety," so H.I.G. could "deflect blame for the consequences of its unilateral [managerial] decision[s]."[47] As a result, Plaintiff criticizes the Investigation as "filled with basic and material errors."[48] During the Investigation, the Special Committee did not consult with Plaintiff or its Board member, did not comply with Plaintiff's request for information, and only provided summary updates to the Board.[49] The Special Committee nevertheless concluded there were "accounting irregularities at

---

[42] *Id.* ¶ 84.
[43] *Id.*
[44] *Id.*
[45] *Id.* ¶ 85.
[46] *Id.* ¶¶ 84, 87.
[47] *Id.* ¶ 82.
[48] *Id.* ¶¶ 83, 90-93.
[49] *Id.* ¶¶ 85-86, 88-90.

Mobileum" before the Transaction.[50] After the Special Committee reached that conclusion, it "proceeded to hand the work product of its purported investigation over to H.I.G.'s outside litigation counsel – a related party transaction prohibited by the [] Partnership Agreement."[51]

Based on the Special Committee's information, H.I.G. filed the Fraud Suit against Audax (and others), arguing "Mobileum's revenue recognition practices were fraudulent and rendered inaccurate the representations and warranties Mobileum gave to H.I.G. as part of the sale of the business."[52] The Fraud Suit alleges these wrongful accounting practices fraudulently induced H.I.G. to enter the Transaction at an inflated price.[53]

Plaintiff denies the Fraud Suit's allegations.[54] Plaintiff additionally alleges Defendants' bad-faith actions continued after H.I.G. filed the Fraud Suit, including: delivering a Notice of Default to Mobileum's lenders; restructuring the Partnership to give H.I.G. more control; continuing to not involve the Board (and thus Plaintiff) in decision making; and maintaining the Special Committee.[55] Plaintiff responded to these actions by filing this lawsuit.

---

[50] *Id.* ¶ 87.
[51] *Id.* ¶ 95.
[52] *Id.* ¶ 96.
[53] *Id.*
[54] *Id.* ¶¶ 95-104.
[55] *Id.* ¶¶ 105-110.

## E. Procedural History

Plaintiff initiated this action in October 2023 and filed its Amended Complaint in January 2024.[56] The Amended Complaint asserts four claims: Breach of Contract (Sections 6.3 and 11.2(a)) against all Defendants;[57] Breach of Contract (Section 8.17) against all Defendants;[58] Breach of the Implied Covenant of Good Faith and Fair Dealing against all Defendants;[59] and Tortious Interference against the Individual Defendants.[60]

On February 5, 2024, Defendants filed their Motion seeking dismissal of all counts in the Amended Complaint.[61] The parties completed briefing on April 19, 2024,[62] and the Court held oral argument on October 30, 2024.[63] On November 12

---

[56] *See generally* Compl.

[57] *See id.* ¶¶ 116-132

[58] *See id.* ¶¶ 133-142.

[59] *See id.* ¶¶ 143-155.

[60] *See id.* ¶¶ 156-160.

[61] *See* D.I. 48, Defendants' Opening Brief in Support of their Motion to Dismiss the Amended Complaint (hereinafter "MTD") at 1-4, 57.

[62] *See generally* D.I. 56, Defendants' Reply Brief in Support of their Motion to Dismiss the Verified Amended and Supplemental Complaint (hereinafter "MTD Reply").

[63] D.I. 77, Judicial Action Form for October 30, 2024. Oral argument on the Motion was delayed pursuant to a March 22, 2024, Order to Stay pending resolution of a motion to dismiss in the Fraud Case. *See* D.I. 48, Judicial Action Form for Motion to Stay Non-Party Discovery and for Protective Order Pending Motion to Dismiss & Motion for Protective Order Pending Resolution of Motion to Dismiss (Chancery). *See also* D.I. 53, Defendants' Motion to Dismiss Tr., March 22, 2024 at 129:16-19 (*Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD) (referencing the fact the Court granted a stay).

and 13, 2024, the parties submitted their respective slides presented during oral argument.[64]

## III.    STANDARD OF REVIEW

The standard governing a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6) is well-settled.[65]  On such a motion:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[66]

The court does not, however, "accept as true conclusory allegations 'without specific supporting factual allegations,'"[67] or draw unreasonable inferences.[68]

## IV.    ANALYSIS

Defendants' Motion makes three general arguments.[69]   First, the Motion argues none of the Defendants can be held liable for the alleged breaches of the

---

[64] *See* D.I. 82, Exhibit A to Letter to Judge Adams from Charles P. Wood enclosing the PowerPoint slides Plaintiff AG Mobile Holdings, L.P. presented during the Court's October 30, 2024 hearing on Defendants' Motion to Dismiss the Verified Amended and Supplemental Complaint; D.I. 83, Exhibit A to Letter to Judge Adams from Michael A. Laukaitis transmitting courtesy copies of presentation used at hearing on Defendants' Motion to Dismiss the Verified Amended and Supplemental Complaint.

[65] *In re General Motors (Hughes) Shareholder Litigation*, 897 A.2d 162, 167-68 (Del. 2006).

[66] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal quotations omitted).

[67] *In re General Motors*, 897 A.2d at 168 (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995)).

[68] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (the Court must accept only "reasonable inferences that logically flow from the face of the complaint" and "is not required to accept every strained interpretation of the allegations proposed by the plaintiff.").

[69] *See generally* MTD.

Partnership Agreement, because the contract stipulated "the entity defendants would have no liability, and . . . non-signatories are not liable for contract breach."[70] Second, Defendants argue the Amended Complaint fails to state a claim for any of the counts asserted.[71] Finally, Defendants argue Plaintiff's "damages claims are not well pleaded," because Plaintiff "lacks standing to seek damages directly" and the direct damages Plaintiff can seek fail to "adequately plead causation."[72] The Court first addresses Defendants' contract-based arguments, as the Court's decision regarding such arguments will dictate whether any Defendants can be liable based on the Partnership Agreement's language.[73]

**A. The Amended Complaint States a Claim for Breach of Section 6.3 of the Partnership Agreement but the Remainder of Plaintiff's claims Fail Under Rule 12(b)(6).**

---

[70] *Id.* at 3, 14-18.

[71] *Id.* at 18-48.

[72] *Id.* at 48-56.

[73] The Court notes Defendants' Motion to Dismiss also challenges whether Plaintiff's damages claims should be dismissed as derivative or for lack of causation. MTD at 48-56. Many of Defendants' arguments regarding damages are necessarily subsumed by the Court's analysis concerning which claims are well-pled and which Defendants can be held liable. *See Infra* IV.A-B. The Amended Complaint does not isolate Plaintiff's requested damages by Count; rather it asserts damages collectively. *See* Compl. Prayer for Relief. As discussed herein, only part of Count I survives the Motion, and it is therefore not clear which damage claims are specific to the part of Count I which survives the Motion. The Court does not separately address the Motion's arguments specific to damages but will entertain argument regarding damages as the case progresses.

Defendants argue the Amended Complaint fails to state any claim.[74] The Court finds Plaintiff only states a claim with respect to Count I regarding the exclusion of Plaintiff's board member from the Special Committee.

### 1. The Amended Complaint Alleges Defendants Breached the Partnership Agreement by Excluding Plaintiff's Board Member from the Special Committee.

Though pled as a single claim, Count I alleges breaches of two separate sections of the Partnership Agreement.[75] First, Plaintiff alleges Defendants breached Section 6.3 of the Partnership Agreement by "establish[ing] [the] Special Committee . . . without advising [Plaintiff] or allowing it to appoint at least one Audax Manager[.]" Second, the Amended Complaint alleges Defendants breached Section 11.2(a) of the Partnership Agreement by "repeatedly refus[ing] to provide financial documents and information requested by the Audax Managers," related to the Investigation.[76]

To state a claim for breach of contract, the complaint must allege "first, the existence of the contract . . . ; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[77] The complaint "need not

---

[74] *See* MTD at 19-48.
[75] *See* Compl. ¶¶ 116-132.
[76] *Id.* ¶ 127.
[77] *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

plead specific facts to state an actionable claim;"[78] rather, "[t]he principal issue at the pleading stage is the existence of a contractual violation."[79]

In interpreting the Partnership Agreement, the court applies well-established principles of contract interpretation. As a general matter, "the parties to a Delaware limited partnership have the power and discretion to form and operate a limited partnership in an environment of private ordering according to the provisions in the limited partnership agreement."[80] "Delaware courts respect the terms of a partnership's governing agreement[]," and recognize parties can "limit liabilities [and] waive fiduciary duties."[81] The court, therefore, interprets such agreements "to give maximum effect to the principle of freedom of contract[.]"[82] When analyzing a partnership agreement, courts apply the general principles of contract interpretation, including ensuring no portion is rendered "illusory or meaningless."[83]

Delaware courts "adhere[] to the objective theory of contract interpretation, meaning the court must attempt to give effect to the parties' shared expectations at the time they entered into those agreements and interpret the contractual language in

---

[78] *Id.* at 611.
[79] *Cygnus*, 302 A.3d at 454 (citing *Garfield v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022)).
[80] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del. 2002).
[81] *Boardwalk Pipeline Partners, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1108–09 (Del. 2022).
[82] 6 *Del. C.* § 17-1101(c).
[83] *See Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992).

17

the manner that 'would be understood by an objective, reasonable third party.'"[84]

The court interprets "'clear and unambiguous terms according to their ordinary meaning' and does not consider evidence outside a contract's four corners unless the contract is ambiguous."[85] A contractual provision is only ambiguous if it is susceptible to two or more meanings.[86]

In reading contracts, "interpretations that are commercially unreasonable or that produce absurd results must be rejected."[87] An interpretation is absurd if it produced "a result 'that no reasonable person would have accepted when entering the contract.'"[88] Courts, "including the Delaware Supreme Court and the United States Supreme Court, have invoked the absurdity doctrine when interpreting [language] that [is] clear on [its] face."[89] Rather than focusing on a provision's text, the absurdity analysis "consider[s] the practical consequences of each [proffered]

---

[84] *Bay Point Capital Partners L.P. v. Fitness Recovery Holdings, LLC*, 2021 WL 55787055, at *4 (Del. Super. Nov. 30, 2021) (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019)).

[85] *Id.* (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)).

[86] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[87] *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1211 (Del. Sept. 13, 2021); *see Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)).

[88] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039 (Del. 2023) (quoting *Manti Hldgs*, 261 A.3d at 1208).

[89] *In re Last Will and Testament of Palecki*, 920 A.2d 413, 424 (Del. Ch. Apr. 26, 2007) (citing *Church of the Holy Trinity v. U.S.*, 143 U.S. 457, 465 (1892); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246–47 (Del. 1985)); *see Director of Revenue v. CAN Holdings, Inc.*, 818 A.2d 953, 958 (Del. 2003) ("[e]ven though the language of the statute is plain and unambiguous, we must decide whether a literal reading of § 1903 leads to unreasonable results.").

reading . . . in deciding which interpretation was intended[.]"[90] The court rejects any interpretation which "produces results that are so at odds with accepted public policy and fundamental fairness," as to suggest the drafters committed "scrivener's error."[91] Based on that standard, courts have applied to absurdity doctrine to reject interpretations of unambiguous text.[92]

Contract interpretation issues "can be pure questions of law that are appropriate to consider on a motion to dismiss."[93] "If two opposing interpretations

---

[90] *In re Last Will and Testament of Palecki*, 920 A.2d at 423.

[91] *Id.* at 424.

[92] *See Bay Point*, 2021 WL 55787055, at *5 ("Taken to its logical conclusion, Fitness's interpretation would allow Peak and Fitness to rewrite all the essential terms in the parties' agreement, including reducing the interest rate to zero, extending the maturity date into perpetuity, or reducing the principal amount owed under the Notes."); *Manti Hldgs*, 261 A.3d at 1211-12 ("[t]he Petitioners' interpretation is commercially unreasonable. It is difficult to imagine that reasonable parties would draft a contractual provision that would require stockholders to "refrain" from exercising a right that would never be ripe to exercise. And it is incredible that the parties included the Refrain Obligation to block appraisal rights only in a roundabout fashion by stopping stockholders from taking the preliminary steps needed to perfect their appraisal claims."). Delaware courts have also applied the absurdity doctrine to reject proffered interpretations of a limited partnership agreement. *See, e.g.*, *Stockman v. Heartland Indus. Partners, L.P.*, 2009 WL 2096213, at *14-15 (Del. Ch. July 14, 2009) (applying the absurdity doctrine to reject an interpretation of a partnership agreement that would "force even successful Indemnitees to demonstrate their compliance with their legal and fiduciary duties, even though such a reading leads to an inefficient result at odds with Delaware's public policies for indemnification."). Delaware courts, however, appear more skeptical of the absurdity doctrine's applicability in the context of limited partnership agreements given the DRUPLA "gives 'maximum effect to the principle of freedom of contract.'" *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017) (quoting 6 *Del. C.* § 17–1101(c)). Courts are therefore more likely to invoke the absurdity doctrine when a "literal reading" would violate the DRUPLA. *See Techmer Accel Holdings, LLC v. Amer*, 2010 WL 5564043, at *8 (Del. Ch. Dec. 29, 2010) ("Under a literal reading . . . a limited partnership could largely avoid the limitations of § 17–804 by a course of action resembling what Crescent did here."). In *Techmer* the court explicitly considered analogues provisions of the DGCL when interpreting "skeletal" portions of the DRULPA. *Id.* at *7-9.

[93] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *8 (Del. Ch. May 5, 2010).

are reasonable," however, "the Court may not choose between them" on a motion to dismiss.[94] On a contractual interpretation issue, "[d]ismissal. . . is proper *only* if the defendants' interpretation is the only reasonable construction as a matter of law."[95]

### a. The Amended Complaint States a Claim for Breach of Section 6.3 of the Partnership Agreement.

Section 6.3 states, in pertinent part, that "[f]or so long as Audax is entitled to appoint at least one Audax Manager . . . each committee of the Board shall have at least one (1) Audax Manager."[96] There is no dispute Plaintiff was entitled to, and did, have at least one Manager on the Partnership's Board throughout the Investigation.[97] The parties also do not dispute that at least some Defendants "refus[ed] to seat an Audax Manager on the [Special] [C]ommittee when [it was] created and afterward."[98] Rather, Defendants argue they were entitled to "exclud[e] Audax's Managers" to "preserve independence," because the Special Committee's purpose was "to investigate allegations of *pre-sale* wrongdoing."[99] Defendants assert Section 6.3 "cannot reasonably be read to say – [] that Audax must have a role to play," in a committee conducting "an investigation into allegations of fraud

---

[94] *Prokupek v. Consumer Capital Partners LLC*, 2014 WL 7452205, at *3 (Del. Ch. Dec. 30, 2014).
[95] *VLIW*, 840 A.2d at 615 (emphasis in original).
[96] Partnership Agreement § 6.3.
[97] *See* MTD at 19-23 (challenging Plaintiff's Section 6.3 claim, but not arguing Plaintiff was not entitled to have a Manager on the Board when the Special Committee was created); MTD Reply at 8-13 (same).
[98] MTD Opp'n at 11; *see* MTD at 19-23 (challenging Plaintiff's Section 6.3 claim, but not claiming an Audax Manager was on the Special Committee); MTD Reply at 8-13 (same).
[99] MTD at 20-21.

implicating Audax."[100] The Court may grant the Motion regarding Section 6.3 if Defendants' interpretation is the only reasonable reading.[101] It is not.

Section 6.3's text requires Plaintiff to have a Manager on "*each* committee of the Board."[102] Delaware courts have equated the word "each," with terms like "every," "each one," and "all."[103] Based on that meaning, Section 6.3 requires Plaintiff to have a Board member on every Board committee. Under that reading, excluding Plaintiff's Board member from the Special Committee would breach Section 6.3.

Defendants argue Plaintiff's reading of the Partnership Agreement leads to an "absurd" result, essentially invoking the implied covenant to attempt to dismiss Plaintiff's claims.[104] Defendants, however, provide no precedential support for the

---

[100] *Id.*

[101] *Fortis Advisors LLC v. Stora Enso AB*, 2018 WL 3814929, at *3 (Del. Ch. Aug. 10, 2018) ("The court may grant a motion to dismiss based on contractual language, however, only if the contractual language is unambiguous—meaning, the language is susceptible of only one reasonable interpretation.").

[102] Partnership Agreement § 6.3 (emphasis added).

[103] *See In re GGP, Inc. Stockholder Litigation*, 282 A.3d 37, 78 (Del. 2022) ("[t]he use of the word 'any' . . . means 'each' or 'every.'") (Montgomery-Reeves, J., concurring in part, dissenting in part); *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *22 (Del. Ch. Apr. 3, 2020) ("'each' as a pronoun, which merely means 'each one.'").

[104] Defendants argue "it would have been 'obvious and provocative' for the [Partnership Agreement] to say that 'if Audax is suspected of fraud, the partnership would have the power to conduct an independent investigation without Audax's involvement.'" MTD Reply at 8-10 (quoting MTD at 22-23; *Dieckman*, 155 A.3d at 368). While acknowledging a limited partnership "can contract away nearly anything," Defendants contend the Court can "'*easily impl[y]*'" a carve-out into Section 6.3 (which prohibits Plaintiff's membership on the Special Committee), "because 'the parties must have intended [it] and have only failed to express [it] because [it was] to obvious to need expression.'" *Id.* at 9 (quoting *Dieckman*, 155 A.3d at 368 (alterations in original) (emphasis added). In arguing the Court should depart from Section 6.3's "'plain meaning,'" Defendants rely on numerous cases which invoke the absurdity and implied covenant doctrines.

21

notion that the implied covenant can be used like a cannon of contract interpretation to reject a reasonable reading of Section 6.3. While a Plaintiff would not typically have a voice on a committee investigating its own alleged fraud, a contrary contractual interpretation does not rise to the level of absurdity needed to overcome a rational reading of Section 6.3's text.[105] The Court will not use the absurdity doctrine to depart from the text of the Partnership Agreement, drafted by sophisticated parties, on a motion to dismiss.[106] Reading Section 6.3 to require Plaintiff to have a member on the Special Committee is at least a plausible construction. Dismissal of Plaintiff's Section 6.3 claim is therefore improper.[107]

---

*Id.* at 9-10 (quoting *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1278 (Del. Super. 2001)) (citing *Dieckman*, 155 A.3d at 368 (evaluating implied covenant claims in the limited partnership context); *Manti Hldgs*, 261 A.3d at 1208 ("Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable *or that produce absurd results* must be rejected." (emphasis added)); *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 138 (Del. Ch. 2023) (applying the absurdity doctrine to reject an interpretation "[o]nly a litigator reading a contract after a dispute has arisen . . . could embrace.")).

[105] *Green Tree Financial Corp. v. Stone*, 2000 WL 1610637, at *4 (Del. Super. Sept. 29, 2000) ("judicial construction in cases of perceived absurd or unjust results flowing from a literal interpretation of language 'is a rule that is cautiously applied.'" (quoting *Magill v. North American Refractories Co.*, 128 A.2d 233, 236 (Del. 1956))); *see Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 692 (Del. 2024) (noting "[a]s the Court of Chancery recognizes, 6 Del. C. § 17-306 permits partnership agreements to contain consequences that would be unavailable in a standard commercial contract[.]" (internal quotations omitted)).

[106] *See Cantor Fitzgerald*, 312 A.3d at 692-93 (strictly enforcing the terms to which "sophisticated parties agree in a limited partnership agreement[.]").

[107] *Id.* ¶¶ 123-125. The Amended Complaint also argues Defendants breached Section 6.3 "by refusing to provide the Audax Managers all documentation and communications sent, received by, or involving the purported Special Committee[.]" *Id.* ¶ 126. The basis of Plaintiff's entitlement to information under Section 6.3 is allegedly its right to place a manager on the Special Committee. *Id.* Section 6.3, however, does not provide any information-based rights, unlike other provisions expressly conveying the right to access records. *See* Partnership Agreement §§ 10.2, 11.2. The Court finds Section 6.3 does not provide Plaintiff the information-based rights it seeks.

The Court **DENIES** Defendants' Motion to Dismiss the portion of Count I concerning Section 6.3.

### b. The Amended Complaint Does Not State a Claim for Breach of Section 11.2(a).

Section 11.2(a) provides, "[t]he Partnership shall deliver to each Manager periodic financial statements, annual audited financial statements, and annual budgets and other financial reports requested by the Board."[108]  Plaintiff argues "Defendants breached this provision when they repeatedly refused to provide financial information and reports to Audax Managers."[109]  Plaintiff specifically challenges the Special Committee's refusal to provide Plaintiff, or its Board member, with documents related to the Investigation.[110]  Plaintiff argues the requested documents fall within Section 11.2(a)'s "*other* financial reports" language.[111]

The only reasonable interpretation of Section 11.2(a)'s "other financial reports" language does not include the information Plaintiff requested.[112]  While the Court must give each term independent meaning,[113] "Delaware courts interpret

---

[108] Partnership Agreement § 11.2(a).
[109] MTD Opp'n at 18-19 (citing Compl. ¶¶ 88, 127-128).
[110] Compl. ¶¶ 88, 127-128.
[111] MTD Opp'n at 21 (emphasis in original).
[112] *See Fortis Advisors*, 2018 WL 3814929, at *3.
[113] *See Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010).

words 'in the context of words surrounding them' and use specific examples to construe general language."[114]

Here, the phrase "other financial reports" is a general term. The Court therefore reads that term in the context of the surrounding specific examples. Such a construction is appropriate given the lack of any comma separating "annual budgets and other financial reports."[115] Reading "other financial reports" in that context, it is clear the term does not include the Special Committee information Plaintiff requests.[116] The specific examples in Section 11.2(a) are all reports on a company's general financial condition prepared in the ordinary course of business. Plaintiff does not allege the Special Committee documents related to the Investigation were prepared in the ordinary course of business.[117] Nor are there any allegations that the requested information related to Mobileum's general financial status, rather, the Special Committee discussed the alleged accounting irregularities.[118] Thus, the information related to the Investigation Plaintiff requested from the Special Committee does not constitute "other financial reports" under

---

[114] *Tetragon Financial Group Limited v. Ripple Labs Inc.*, 2021 WL 1053835, at *5 (Del. Ch. Mar. 19, 2021) (quoting *Agar v. Judy*, 151 A.3d 456, 473 (Del. Ch. 2017)).
[115] Partnership Agreement § 11.2(a).
[116] Plaintiff requests "all documents received by counsel for the Special Committee, and all communications with counsel for the Special Committee . . . the entirety of [the Special Committee's counsel's] legal file . . . and . . . all financial information requested by the Audax Managers." Compl. Prayer for Relief ¶ e.
[117] *See generally id.*
[118] *See generally id.*

Section 11.2(a). Plaintiff's allegation that Defendants withheld the requested information does not state a claim for breach of the Partnership Agreement. The Court **GRANTS** the Motion as it relates to the Section 11.2(a) portion of Count I.[119]

### 2. The Amended Complaint Does Not Allege a "Transaction" Occurred which Breached Section 8.17.

Count II of the Amended Complaint alleges Defendants breached Section 8.17 of the Partnership Agreement.[120] Section 8.17 prohibits H.I.G. from "engag[ing] in any *transaction* . . . with the Partnership," except in certain circumstances.[121] The Amended Complaint articulates several actions which Plaintiff alleges breached Section 8.17.[122] The crux of the parties' arguments related to Count II is whether

---

[119] The Court notes its holding that the Amended Complaint does not state a claim for breach of Section 11.2(a) seems to support Defendants' argument concerning Section 6.3. *Infra* IV.A.1.b. That is because Plaintiff's primary theory of liability based on Section 11.2(a) is "the exclusion of an Audax Manager from the Special Committee . . . depriv[ed] [Plaintiff] of the documentation and information shared with or created by the purported Special Committee (on which an Audax Manager is contractually entitled under Section 6.3 of the Limited Partnership Agreement to sit)." Compl. ¶ 128. Even if Plaintiff was improperly excluded from the Special Committee, Section 11.2(a) would not necessarily entitle Plaintiff to the requested information. *See Supra* n.116 (detailing the information Plaintiff seeks pursuant to Section 11.2(a)). This is especially true given Section 11.2(a) concerns the Managers' access to a specific type of information. *See* Partnership Agreement § 11.2(a) ("The Partnership shall deliver to each Manager *periodic financial statements, annual audited financial statements, and annual budgets and other financial reports* requested by the Board." (emphasis added); *Supra* IV.A.1.b (interpreting Section 11.2(a)'s text)). Regardless, the Court concludes its rulings are true to the Partnership Agreement's text, which "is the cornerstone of a Delaware limited partnership, and effectively constitutes the entire agreement among the parties with respect to . . . operation and termination of, the limited partnership." *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) (quoting Martin I. Lubaroff & Paul Altman, *Delaware Limited Partnerships* § 1.2 (1999)).
[120] MTD at 29-37.
[121] Partnership Agreement § 8.17 (emphasis added).
[122] Compl. ¶ 140 ("In violation of Section 8.17 of the Limited Partnership Agreement, each of the Defendants nevertheless caused the Partnership to enter into a related party transaction with H.I.G., including but not limited to: the establishment of a Special Committee intended solely to benefit the H.I.G. Defendants and to the detriment of the Partnership and Mobileum's employee and

25

any of the challenged actions was a "transaction . . . with the Partnership."[123]  Using fundamental interpretive principles, the Court finds the answer is no.

The Partnership Agreement does not define "transaction."  Accordingly, the Court turns to dictionary definitions to ascertain that term's meaning.[124]  Multiple dictionaries define "transaction" to mean "an occasion when someone buys or sells something" or "the process of doing business."[125]  Based on that definition, the only "transaction" the Amended Complaint challenges is "the engagement of counsel purportedly representing the Special Committee, all expenses of which were paid for by the Partnership[.]"[126]  Even if the hiring of counsel was a "transaction," it does not fall within Section 8.17's language because the hiring of counsel was not a H.I.G. action "with the Partnership."[127]  Dictionaries demonstrate "with" is "used as a

---

customer relations; the engagement of counsel purportedly representing the Special Committee, all expenses of which were paid for by the Partnership; the production of documents, analysis, and the work product of the sham investigation to the H.I.G. Defendants and their separate counsel; the direct involvement of H.I.G.'s counsel in the Special Committee's investigation; and the use of the sham investigation in negotiations with Mobileum's lenders for H.I.G.'s self-interested aim of deflecting responsibility for running Mobileum's business into the ground.").

[123] Partnership Agreement § 8.17.

[124] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 339 (Del. 2022) ("Court[s] often looks to dictionaries to ascertain a term's plain meaning." (internal quotation omitted)).

[125] *Transaction*, CAMBRIDGE BUSINESS ENGLISH DICTIONARY (1st ed. 2011); *see Transaction*, THE BRITANNICA DICTIONARY (2024) ("a business deal: an occurrence in which goods, services, or money are passed from one person, account, etc., to another" and "the act or process of doing business with another person, company, etc.: the act or process of transacting business."); *Transaction*, MERRIAM-WEBSTER (2024) ("something transacted *especially*: an exchange or transfer of goods, services, or funds.").

[126] Compl. ¶ 140.

[127] Partnership Agreement § 8.17.

26

function word to indicate a participant in an action, transaction, or arrangement."[128] This definition shows a transaction only falls within Section 8.17 if both H.I.G. and the Partnership were participants. There are no allegations H.I.G. participated in the Special Committee's hiring of counsel.[129] The Amended Complaint therefore does not allege a transaction covered by Section 8.17 occurred, such that it states a claim Defendants breached that provision. The Court **GRANTS** Defendants' Motion to Dismiss Count II.

### 3. Plaintiff Does Not State a Claim for Breach of the Implied Covenant.

Count III of the Amended Complaint alleges a breach of the implied covenant of good faith and fair dealing. The implied covenant is a gap-filling mechanism to address issues "neither party anticipated."[130] While the implied covenant "is inherent in all contracts," its role is limited to ensuring the parties do not "frustrat[e] the fruits of the bargain."[131] Thus, "[i]t does not apply when the contract addresses the conduct at issue."[132] For a plaintiff to state a breach of the implied covenant, the plaintiff must identify some contractual gap for the covenant applies.[133]

---

[128] *E.g.*, *With*, MERRIAM-WEBSTER (2024).
[129] *See generally* Compl.
[130] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).
[131] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1009, 1116 (Del. 2022).
[132] *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015).
[133] *Miller v. HCP & Co.*, 2018 WL 656378, at *2 (Del. Ch. 2018), *aff'd sub nom.*, *Miller v. HPC Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018).

Here, the Amended Complaint's implied covenant claim focuses on three sets of allegations: (1) Audax was allegedly sidelined from management;[134] (2) H.I.G. allegedly conducted a "sham investigation" and excluded Audax;[135] and (3) H.I.G. supposedly mismanaged Mobileum.[136] After Defendants challenged each of those allegations,[137] Plaintiff only substantively reaffirmed its argument that "Defendants breached the implied covenant of good faith and fair dealing by routinely making fundamental business decisions without any Board consultation, deliberation, or participation."[138] "[F]ail[ure] to respond to [an] argument" made in a motion to dismiss constitutes "waive[r]."[139] As a result, the only implied covenant claim before the Court is related to Defendants' alleged failure to consult the Board, and by extension Plaintiff, before making managerial decisions.

---

[134] Compl. ¶¶ 148, 152.

[135] *Id.* ¶¶ 149-50.

[136] *Id.* ¶¶ 147, 153.

[137] MTD at 37-42.

[138] MTD Opp'n at 38-46. Plaintiff's only response regarding its implied covenant claim related to the Investigation, Defendants' alleged mismanagement, and Plaintiff's requests for information is a conclusory restatement of the Amended Complaint's allegations, relegated to a footnote. *Id.* at 46 n. 19 ("Defendants also violated the implied covenant by conducting a bad-faith, sham investigation as discussed at length in Part I. And in the alternative, Defendants breached the implied covenant by withholding information about the sham investigation, when Audax reasonably believed it would receive the same information other Managers received about the investigation.").

[139] *Bocock v. Innovate Corp., Inc.*, 2022 WL 17101448, at *2 (Del. Ch. Nov. 22, 2022); *see Reith v. Lichtenstein*, 2019 WL 2714065, at *19 (June 28, 2019) ("Plaintiff did not address aiding and abetting at all in his brief or at argument. By failing to respond, Plaintiff abandoned this claim. It is dismissed."); *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *16 (Del. Ch. May 10, 2018) (ruling plaintiff's failure to respond to arguments raised in support of motion to dismiss meant it "abandoned every claim" not addressed); *see also Emerald Pr's v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Plaintiff maintains the Partnership Agreement "implicitly required Defendants to consult with Audax Managers before making Board-level decisions that could significantly impact Mobileum."[140] This obligation allegedly arises from the Partnership Agreement granting "Audax two Board seats and representation on each committee."[141] Plaintiff argues the Partnership Agreement does not have a provision requiring Defendants to consult the Board, because it was "obvious . . . the parties must have intended" such a result.[142] Thus, Defendants' alleged failure to consult the Board before making major changes at Mobileum "frustrated the purpose" of those provisions.[143] That conclusion, however, ignores the Partnership Agreement's robust allocation of unilateral managerial rights to Defendants.

The Partnership Agreement outlines the parties' managerial rights and responsibilities regarding the Partnership in detail.[144] Article VI emphasizes H.I.G.'s ability to direct the Partnership.[145] Because the Partnership Agreement establishes

---

[140] MTD Opp'n at 40 (citing Compl. ¶¶ 52, 55).
[141] *Id.*
[142] *Id.* at 41.
[143] *Id.* at 38-39.
[144] *See* Partnership Agreement Article VI – "Management of the Partnership."
[145] *Id.* §§ 6.11 (stating "one H.I.G. Manager shall be required in order to establish a quorum at any [Board] meeting."), 6.12 (establishing the H.I.G. Managers are "collectively entitled to a number of aggregate votes on any matter submitted to a vote at a meeting of the Board or any committee thereof equal to" a majority of the votes available to be cast.); 6.13 (stating "the affirmative vote of the elected managers holding a majority of the total votes shall be the act of the Board."), 6.15 (establishing "[a]ny action required to be, or which may be, taken by the Board or any committee thereof may be taken without a meeting, without prior notice and without a vote if a consent in writing setting forth the action so taken is signed by the elected managers or committee members, as applicable, holding a majority of the total votes that would be eligible to be cast at such meeting.").

29

the "H.I.G. Managers" will necessarily have a majority of votes for any Board resolution,[146] Defendants can control the Partnership's actions without calling a Board meeting or vote.[147]  The Partnership Agreement's text, therefore, contradicts Plaintiff's suggestion that Defendants were required to consult its Board Member before the Board made major managerial decisions.  Plaintiff's argument that such a provision was "obvious[ly]" part of the parties' bargain,[148] is therefore unconvincing.

Where sophisticated parties addressed a certain contractual issue, the Court will not "imply terms that parties failed to include but which could have been drafted."[149]  The Partnership Agreement is not silent on the parties' managerial rights.[150]  The Partnership Agreement gives Plaintiff the right to appoint two Board members, attend and call meetings, and vote,[151] but not the right to be consulted before the Board directed the Partnership's actions.  As discussed above, the Partnership Agreement's text suggests such a right was not part of the parties' bargain.  Accordingly, there is no "gap" in the Partnership Agreement related to the Partnership's management, such that the implied covenant applies.  The Court will not use the implied covenant to rewrite the parties' agreement.[152]  The Amended

---

[146] *Id.* § 6.12.
[147] *See id.* §§ 6.12, 6.15.
[148] MTD Opp'n at 41.
[149] *Baldwin*, 283 A.3d at 1117.
[150] *See* Partnership Agreement Article VI.
[151] *Id.* §§ 6.2(b), 6.7, 6.12.
[152] *Baldwin*, 283 A.3d at 1116-17.

Complaint fails to state a claim for breach of the implied covenant. Defendants' Motion to Dismiss is **GRANTED** with respect to Count III.

**B. The Complaint only States a Claim for Breach of Contract Against the Individual Defendants.**

Having found the Amended Complaint only states a claim for the Section 6.3 portion of Count I, the Court next considers which Defendants can be held liable for the alleged breach. The Motion advances a variety of contentions to ultimately argue no Defendant can held liable for the alleged breach.[153] Plaintiff resists Defendants' argument and maintains all Defendants can be held liable.[154] The Court concludes the Amended Complaint only states a claim for breach of Section 6.3 against the Individual Defendants.

**1. The Partnership Agreement Prevents Plaintiff's Claim against the Limited Partners.**

The unambiguous terms of Section 3.2(a) provide Limited Partners H.I.G. and H.I.G. Tech cannot be liable for any breach of the Partnership Agreement.[155] Section 3.2(a) states, "no Limited Partner . . . shall have any personal liability whatsoever . . whether to the Partnership [or] to any of the other Partners . . . for any losses of the Partnership." This provision is consistent with the Delaware Revised Uniform Limited Partnership Act which "allows a partnership to eliminate 'and any all

---

[153] *See* MTD at 3, 14-18.
[154] MTD Opp'n at 30-38.
[155] MTD at 14-16.

31

liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership[.]'"[156]

This provision also comports with Partnership Agreement Sections: (1) 6.1 which states that "the Board shall make all decisions and take all actions for the Partnership which are necessary or appropriate to carry out the Partnership's business and purpose;[157] and (2) 8.3, which states that "No Partner or other Holder. . .shall have the authority or power to represent or act for or on behalf of the Partnership, to do any act that would be binding on the Partnership, or to make any expenditures or incur any obligations on behalf of the Partnership."[158] While the Partnership Agreement gives the Special Limited Partner certain managerial powers,[159] it also states that additional authority does not abrogate limited liability.[160]

Plaintiff does not dispute Section 3.2(a) eliminates Limited Partners' liability for Partnership obligations, but asserts that boilerplate provision is not a broader waiver of any cause of action against Limited Partners.[161] Plaintiff notes the Partnership Agreement waives liability "[e]xcept as expressly set forth in this

---

[156] Boardwalk, 288 A.3d at 1108 (quoting 6 *Del. C.* § 17-1101(f)).
[157] *See* Partnership Agreement § 6.1.
[158] *Id.* § 8.3.
[159] *See* Partnership Agreement § 6.1 (establishing the powers of the Special Limited Partner to consult the General Partner and manage the Partnership jointly with the General Partner).
[160] *See id.* § 9.1. *See also id.* § 3.2(a) (absolving all "Limited Partner[s] [of] . . . any personal liability whatsoever[,]" without exception).
[161] MTD Opp'n at 31-32.

Agreement," and permits liability for bad-faith actions.[162]   Because the Amended

Complaint does not seek to hold Defendants liable for the Partnership's obligations,

but for bad-faith breach of contract, Plaintiff argues Section 3.2(a) does not absolve

H.I.G. or H.I.G. Tech of potential liability.[163]

Plaintiff's reading of the Partnership Agreement cannot be accepted.  As the

Supreme Court of Delaware recently held, "Delaware courts respect the terms of a

partnership's governing agreements to preserve the maximum flexibility of

contract."[164]  Here, the parties did just that – the Partnership Agreement contained

broad limitations of liability for the Limited Partners, while also severely limiting

the Limited Partners' ability to participate in management and bind the Partnership.

Plaintiff was "put on notice" when it signed the Partnership Agreement and cannot

use creative pleading to attempt to put the Limited Partners on the hook for actions

they cannot actually take pursuant to the Partnership Agreement.[165]

---

[162] Partnership Agreement §§ 3.2(a), 6.17.

[163] MTD Opp'n at 31-32.

[164] *Boardwalk*, 817 A.3d at 1108-09 (internal quotations and citations omitted).

[165] *See id.* at 1109 ("Our strict approach to contract interpretation and enforcement puts investors on notice regarding the primacy of partnership agreements. . . .") (internal citations and quotation omitted).  Plaintiff also makes a "sky is falling" argument that Defendants' reading, "basically leaves no one – according to them, no one that can be liable for a breach of 6.3 even though the right was clearly breached.  That can't be the law."  D.I. 95, Defendants' Motion to Dismiss Tr., Oct. 30, 2024 at 66:10-13.  As this Court has previously held, however, "[t]he partners may use their partnership agreement to order the relations between them and eliminate 'any and all liabilities for breach of contract and breach of duties (including fiduciary duties)' that would otherwise arise." *Seibold v. Camulos Partners LP*, 2012 WL 4076182, at *10 n. 97 (Del. Ch. Sept. 17, 2012) (quoting 6 *Del. C.* § 17-1101(d)).  This is precisely what the parties agreed to here.  *See Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, 2023 WL 4571932, at *8 (Del. Ch. July 17, 2023) ("[t]he DRULPA also permits the partnership to replace [fiduciary duties] with contractual

Plaintiff also cites to Partnership Agreement Sections 6.3, 6.17(a), 8.17, and 11.2(a) as exceptions to the broad language in Section 3.2(a). None of these provisions set forth applicable exceptions to Section 3.2(a)'s otherwise expansive grant of limited liability. Section 6.3 concerns the parties' right to appoint managers to the Partnership Board, but it does not discuss liability or mention the Limited Partners.[166] Section 11.2(a) does not mention the Limited Partners or liability.[167] Section 8.17 restricts the ability of H.I.G. and its affiliates to transact with the Partnership, and does not discuss any waiver of limited liability.[168] Section 6.17(a) broadens the Partnership Agreement's grant of limited liability, and moreover, does not reference the Limited Partners.[169]

Finally, with the exception of damages discussed in relation to the Individual Defendants, the damages Plaintiff seeks would all be "Partnership" losses, including:

---

duties. . . . [therefore] [t]he appropriate contractual standard varies with the partnership agreement's precise language. One word can make all the difference." (internal quotations omitted) (citing *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 252 (Del. 2017) (citing 6 Del. C. § 17-1101(d)); *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013)).

[166] *See* Partnership Agreement § 6.3.

[167] *See id.* § 11.2(a).

[168] *See id.* § 8.17.

[169] *See id.* § 6.17(a).

(1) mismanagement of Mobileum and Matrix Topco GP;[170] and (2) amounts "wasted" by the Special Committee's alleged "sham investigation."[171]

For these reasons, Plaintiff cannot state a claim against the Limited Partners.

## 2. The Limited Partnership Agreement Prevents Plaintiff's Claim against the General Partner.

Defendants note Matrix Topco GP "irrevocably delegate[d] all of its rights and powers" to manage the Partnership, to the Board.[172] Defendants also argue Matrix Topco GP's status as a Partner, "makes clear that it would have no 'authority or power to represent or act for or on behalf of the Partnership[.]'"[173] Because Matrix Topco GP had no authority to direct, manage, or act for the Partnership, Defendants maintain it "cannot be liable for breach[.]"[174]

Plaintiff acknowledges Matrix Topco GP's delegation of authority, but counters "[n]othing in the General Partner's delegation in Section 6.1 purports to eliminate its liability for contract breaches it directed that were performed by Board members[.]"[175] Plaintiff asserts the Amended Complaint alleges Matrix Topco GP,

---

[170] Compl. ¶ 76 ("H.IG.'s mismanagement resulted in significant harm to Mobileum's business."); ¶¶ 60, 63, 76 (describing how Mobileum lost customers, and, as a result, Mobileum's sales suffered, and Mobileum's revenue and profits were down); ¶¶ 147, 153 (H.I.G. "damage[d] Mobileum's business and business opportunities," causing "severe damages to the business."); *see also Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("A claim of mismanagement resulting in corporate waste . . . represents a direct wrong to the corporation that is indirectly experienced by all shareholders[,]" and, "thus, the wrong alleged is entirely derivative in nature.")
[171] Compl. ¶¶ 9, 129, 142.
[172] Partnership Agreement § 6.1.
[173] MTD at 16-17 (quoting Partnership Agreement § 3.3).
[174] *Id.*
[175] MTD Opp'n at 32.

along with other Defendants, "directed the Board to breach the [Partnership Agreement]."[176] Plaintiff similarly alleges Matrix Topco GP "participated in the breaches directly and through its appointed Board members," thus it can be held liable for breach of contract.[177]

Defendants' position is consistent with precedent and the Partnership Agreement's text. A fundamental principle of contract law is "[a] plaintiff only can assert a breach of contract claim against a party that owed the pertinent obligation under the agreement."[178] This Court has applied that principle to limited partnership agreements.[179] Moreover, "Delaware does not recognize a cause of action for aiding and abetting a breach of contract."[180]

Here, the Amended Complaint asserts contractual claims against Matrix Topco GP.[181] The Partnership Agreement, however, explicitly provides Matrix Topco GP "irrevocably delegate[d] all of its rights and powers [to manage the Partnership] under the Act pursuant to Section 17-403(c) thereof[,] and the Board

---

[176] *Id.* (citing Compl. ¶¶ 1, 8, 11, 16, 82-89, 95).
[177] *Id.* at 33 (citing Compl. ¶¶ 133-160).
[178] *In re P3 Health Group Holdings, LLC*, 2022 WL 16548567, at *11 (Del. Ch. Oct. 31, 2022); *see Gotham Partners*, 817 A.2d at 172 ("It is a general principle of contract law that only a part to a contract may be sued for breach of contract.").
[179] *See In re Kinder Morgan, Inc. Corp. Reorg. Litig.*, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015) (dismissing a breach of a limited partnership agreement claim, asserted against an entity which "did not owe the contractual obligation that the Complaint [sought] to enforce.").
[180] *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021, at *13 (Del. Ch. June 23, 2015) (citing *Allen v. El Paso Pipeline GP Co.*, 2014 WL 8266199, at *22 (Del. Ch. June 20, 2014).
[181] Compl. ¶¶ 116-155.

shall make all decisions and take all actions for the Partnership[.]"[182]  Given such a broad delegation of authority, a general partner only remains liable for breach of a partnership agreement where it retained a "duty to oversee its delegates."[183]  Matrix Topco GP's delegation shows that the General Partner had neither oversight responsibilities, nor any obligations regarding the Partnership's management. Because Plaintiff's damage claims focus on the alleged mismanagement of the Partnership,[184] Matrix Topco GP cannot be liable for breach.

### 3. The Amended Complaint Does Not State a Claim Against the Partnership.

Defendants assert the Partnership "is also an improper defendant[] . . . [because] [t]here is no explanation for how the Partnership itself could be liable to one of the limited partners, let alone for losses caused to itself."[185]  Plaintiff maintains the Partnership is a proper defendant, because "[t]he Complaint alleges that the Partnership participated in the breaches of the [Partnership Agreement]."[186] Specifically, Plaintiff contends "[i]t would [] be 'premature' to dismiss . . . the

---

[182] Partnership Agreement § 6.1.

[183] *Forsythe v. ESC Fund Management Co. (U.S.), Inc.*, 2007 WL 2982247, at *7-8 (Del. Ch. Oct. 9, 2007).  Plaintiff cites *Forsythe* to argue a general partner "remain[s] liable for breach of obligations it retained in the limited partnership agreement." MTD Opp'n at 33.  *Forsythe* does not alter the analysis here.  In Forsythe, the general partner delegated its managerial authority but expressly retained a "duty to oversee its delegatees" which was "clearly stated in the Offering Documents and the Partnership Agreement," *Forsythe*, 2007 WL 2982247, at *8.  Here, Matrix Topco GP retained no such oversight authority, such that it can be held liable for Plaintiff's breach claims.

[184] Compl. ¶¶ 9, 60, 63, 76, 129, 142, 147, 153.

[185] MTD at 17.

[186] MTD Opp'n at 34-35.

Partnership," because the Amended Complaint alleges the non-Partnership Defendants directed the Partnership to breach and "'a potential remedy' [sic] 'may involve' the Partnership[.]"[187] Given only Plaintiff's Section 6.3 claim survives the Motion,[188] that argument is unconvincing.

Count I alleges Defendants breached Section 6.3 by excluding Plaintiff's Board member from the Special Committee.[189] Section 6.3 states that the "Board" determines committee membership in accordance with the limitations therein.[190] The decision to exclude Plaintiff's Board member from the Special Committee was therefore made by the Board, not the Partnership. The Amended Complaint contains no specific allegations regarding how the Partnership participated in, or was used by Defendants to effectuate, that decision.[191] As discussed above, most of Plaintiff's damages claims represent Partnership losses.[192] The Amended Complaint does not

---

[187] *Id.* (quoting *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *21 (Del. Ch. Oct. 7, 2019).

[188] *Supra* IV.A.

[189] *See* Compl. ¶¶ 116-126.

[190] Agreement § 6.3 ("[t]he Board may designate one (1) or more committees of the Board[.]").

[191] *See generally* Compl. *See also El Paso Pipeline GP Company, L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) ("[t]he reality that limited partnership agreements often govern the territory that in corporate law is covered by equitable principles of fiduciary duties does not make all provisions of a limited partnership agreement enforceable by a direct claim.").

[192] *Supra* IV.B.1.

state a claim for breach against the Partnership,[193] and it is not premature to dismiss the Partnership.[194]

### 4. Plaintiff States a Claim Against the Individual Defendants.

The Individual Defendants, as members of the Board which controls the Partnership, can be held liable for the alleged breach of Section 6.3 of the Partnership Agreement. As a preliminary matter, the Court notes Defendants' argument to the contrary is inconsistent with their position concerning the other entities. Defendants argue the non-Individual Defendants cannot be liable for breach because the Partnership Agreement gives the Board full authority to direct the Partnership.[195] This contention conflicts with Defendants' assertion that the "Individual Defendants are not liable for contract breach as a matter of law,"[196] given the Partnership Agreement's express delegation of all managerial authority to the Board.[197]

---

[193] *See Brinckerhoff*, 152 A.3d at 1257-65 (holding a plaintiff could not assert claims against a partnership for causes of actions dealing with losses the partnership itself experienced).

[194] *See In re CVR Refining, LP Unitholder Litigation*, 2020 WL 506680, at *12-13 (Del. Ch. Jan. 31, 2020) (holding a cause of action did "not state a claim against the Partnership because the General Partner did not cause the Partnership to take any action in connection with the [relevant contractual right].").

[195] MTD at 14-17.

[196] *Id.* at 17-18 (cleaned up).

[197] Partnership Agreement § 6.1. The Partnership Agreement provides that the Board is comprised of the individual appointed managers, which includes the Individual Defendants. *See id.* § 6.2. Beyond the conflict discussed above, Defendants' position also conflicts with its argument that the non-Individual Defendants cannot be liable for breach of Section 6.3, because that provision only applies to the Board. MTD Reply at 8. Accepting Defendants' argument as true, the Individual Defendants, as members of the Board, can be liable for any breach of Section 6.3.

Defendants' contradictory arguments suggest the Individual Defendants may be liable for a breach of the Partnership Agreement.

While true the Individual Defendants did not sign the Partnership Agreement,[198] that alone does not preclude their liability. A party "does not have to be a signatory of a contract [] to become bound by it."[199] For a non-signatory to be bound by a contract, they must "expressly or implicitly adopt[] the agreement."[200] The contract itself "must contemplate that non-signatories may adopt it."[201] Here, based on the plaintiff-friendly motion to dismiss standard, that requirement is met. The Partnership Agreement delegated all authority to manage the Partnership to the Board.[202] The Board, in turn, is comprised of "Managers," some of whom are listed in the Partnership Agreement.[203] Based on those provisions, the Partnership Agreement contemplated non-signatories would adopt its provisions through their membership on the Board. The Amended Complaint's numerous allegations that the Individual Defendants, through their Board membership, directed the Partnership,[204]

---

[198] *See generally* Partnership Agreement.

[199] *American Legacy Foundation v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. Jan. 30, 2003). *See also In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57 (Del. 2019) (rejecting the argument, "only formal parties . . . are bound by the terms of the [operative agreement].").

[200] *American Legacy*, 831 A.2d at 343-44 (citing *Wiggins Ferry Co. v. Ohio & Mississippi Ry. Co.*, 142 U.S. 396, 408 (1892)).

[201] *Id.* at 344.

[202] Partnership Agreement § 6.1.

[203] *Id.* §§ 1.1, 6.2. The Partnership Agreement provides the listed Managers may change over time at the discretion of the entity appointing said manager as their Board representative. *Id.* § 6.2.

[204] Compl. ¶¶ 24-26, 29-30, 60, 82-87, 123, 150.

create a reasonable inference that the Individual Defendants adopted the Partnership Agreement.[205] The Complaint states a claim for breach of the Partnership Agreement against the Individual Defendants.[206]

For the sake of clarity, the Court notes it takes no position regarding whether Plaintiff would be entitled to its claimed damages should the Individual Defendants be found liable for breach of Section 6.3. Given the Amended Complaint pleads damages collectively,[207] yet only Count I survives the Motion,[208] it is unclear what damages Plaintiff could recover for a breach of Section 6.3 alone. The Court need not address that issue at this stage.[209] Rather, it is sufficient the Amended Complaint states a claim for breach of Section 6.3 against the individual defendants and gives "Defendants adequate notice of the *existence* of damages."[210]

---

[205] The Amended Complaint's allegations also give rise to a reasonable inference that the Individual Defendants can be held liable for breach as a "successor" or "assign[]" of Matrix Topco GP. *See* Compl. ¶¶ 46 (detailing the delegation of the GP's authority to the Board), 50 (same); Partnership Agreement § 17.7 (providing the Partnership Agreement "is binding on" any "successors" or "assigns."). This Court has held liability could exist under similar circumstances and contractual language. *In re CVR Refining*, 2020 WL 506680, at *11 n.90 (holding a non-signatory "did not become bound by [the partnership agreement's] terms until the General Partner assigned the [relevant rights] in January 2019.").

[206] Because the Court concludes the Amended Complaint states a claim for breach of the Partnership Agreement against the Individual Defendants, Plaintiff's tortious interference claim (Count IV) necessarily fails. *Kuroda*, 971 A.2d at 884 ("[i]t is well settled that a party to a contract cannot be held liable for [both] breaching the contract and for tortiously interfering with the contract."). Defendants' Motion to Dismiss is **GRANTED** with respect to Count IV.

[207] *See* Compl. Prayer for Relief.

[208] *See Supra* IV.A.

[209] *I Am Athlete, LLC v. IM EnMotive, LLC*, 2024 WL 4904685, at *7 (Del. Super. Nov. 27, 2024) ("so long as Plaintiff sufficiently pleads facts which, if true, show the 'existence' of damages, arguments as to the 'amount' of damages do not justify granting a dismissal.").

[210] *Id.* at *8 (emphasis added).

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to dismiss is **GRANTED** in part, **DENIED** in part.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**